ROBERT DOBOS & others [1] *vs.* PAUL DRISCOLL
& others [2].

Suffolk. October 7, 1988. — April 19, 1989.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Civil,* Severance, Mistrial, Instructions to jury. *Civil Rights,* Immunity of public official, Availability of remedy. *Public Officer. Police,* Commonwealth's liability, Negligence, Unlawful arrest. *Governmental Immunity. Massachusetts Tort Claims Act. Commonwealth,* Liability for tort. *Negligence,* Public officer.

In an action against a State police officer, four of his supervisors, and the Commonwealth, resulting from the officer's alleged misconduct in his treatment of a motorist during and after a traffic incident, the judge did not abuse his discretion either by refusing to grant the officer a trial separate from that of the other defendants or by denying the officer's motions for a mistrial on the ground of prejudicial joinder. [644-645]

At the trial of Federal civil rights claims against four supervisory officials of the State police, including a former Commissioner of Public Safety, resulting from a State police officer's alleged misconduct in his treatment of a motorist during and after a traffic incident, the defendants were not entitled to qualified, or "good faith," immunity under 42 U.S.C. § 1983 (1979), as amended, where the law was clearly established, during the tenure of each of the defendants and prior to the incident in 1978, that conduct of police supervisors resulting in the infliction of injuries by a subordinate violates the constitutional rights of the injured individuals, and where there was extensive evidence that the defendants had notice of this officer's past culpable conduct and had failed to prevent a recurrence of such conduct. [645-650] LYNCH, J., with whom NOLAN & O'CONNOR, J.J., joined, dissenting.

At the trial of negligence claims against the Commonwealth under the Massachusetts Tort Claims Act, G. L. c. 258, resulting from a State police

---

[1] His wife Donna Dobos and his daughter Laura Jane Dobos. His daughter Jennifer is not a party to this action.

[2] John F. Kehoe, Jr., Frank Trabucco, James Canty, Robert Hunt (supervisory defendants), and the Commonwealth.

officer's alleged misconduct in his treatment of a motorist during and after a traffic incident, the jury were warranted in concluding that certain acts or failures to act on the part of four supervisory officials of the State police were not pursuant to any "discretionary function" within the meaning of the exemption from liability contained in G. L. c. 258, § 10 (b), where the jury could properly find that the supervisors, in their treatment of previous disciplinary incidents involving this officer, had failed to implement existing policy requirements; moreover, this court concluded that the imposition of tort liability would neither jeopardize the quality and efficiency of the governmental process nor usurp the power and responsibility of coordinate branches of government. [650-653] LYNCH, J. with whom NOLAN & O'CONNOR, JJ., joined, dissenting.

Negligence claims against the Commonwealth under the Massachusetts Tort Claims Act, G. L. c. 258, resulting from a State police officer's allegedly assaultive behavior were not barred by language of G. L. c. 258, § 10 (c), exempting a public employer from liability for claims "arising out of" intentional torts, where the true focus of the claims was the actions, or failures to act, of supervisory officials, rather than the intentional conduct of the officer. [653]

At the trial of Federal civil rights claims against four supervisory officials of the State police, resulting from a State police officer's alleged misconduct in his treatment of a motorist during and after a traffic incident, the judge correctly instructed the jury that the standard for imposing liability on the defendants for their failure to supervise or discipline the officer was "gross negligence amounting to conscious indifference to the safety of the public." [654-656]

At the trial of Federal civil rights claims against four supervisory officials of the State police, resulting from a State police officer's alleged misconduct in his treatment of a motorist during and after a traffic incident, the jury could properly conclude that each defendant was consciously or deliberately indifferent to the safety of the public, and proximately caused the plaintiff's injuries, where the evidence permitted a finding that each of the supervisors knew or should have known of the officer's propensities to abuse and assault members of the motoring public and yet allowed him to return to highway duty after previous misconduct without proper investigation or safeguards. [656-658] LYNCH, J., with whom NOLAN & O'CONNOR, JJ., joined dissenting.

CIVIL ACTION commenced in the Superior Court Department on August 20, 1981.

The case was tried before *John Paul Sullivan*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*John T. Landry, III*, Special Assistant Attorney General (*Mark P. Sutliff & William Mitchell*, Assistant Attorneys General, *& Stanley Adelman* with him) for John F. Kehoe, Jr., & others.

*Richard L. Zisson* for Paul Driscoll.

*David C. Casey* (*Deborah A. Tootalian*, with him) for the plaintiffs.

LIACOS, J. This is an appeal from judgments entered against a State trooper, Paul Driscoll, his supervisors, and the Commonwealth. The plaintiffs brought suit against Driscoll for violation of Dobos's civil rights, 42 U.S.C. § 1983 (1979), as amended, and under the common law for assault and battery, false imprisonment, and the intentional or reckless infliction of emotional distress. The supervisory defendants were sued under 42 U.S.C. § 1983; the Commonwealth was sued for negligence. G. L. c. 258 (1986 ed.). The wife and daughter sued for loss of consortium. Special questions were submitted to the jury, and a judgment was entered for the plaintiffs pursuant to Mass. R. Civ. P. 58 (a), as amended, 371 Mass. 908 (1977).[3] We summarize the facts as they could have been found by the jury.

1. *Evidence against Driscoll.* At midday on September 4, 1978, Robert Dobos was driving, with his wife and daughters, on Route 128 near Framingham, when the driver of another vehicle, Bruce Mancinelli, began to harass Dobos. Mancinelli's vehicle eventually struck the passenger side of Dobos's vehicle. Dobos responded by gradually forcing Mancinelli to drive to a

---

[3] The jury awarded Donna and Laura Dobos zero dollars each for their claim of a loss of consortium. However, the docket reflects that judgments on the jury verdict were awarded to Donna and Laura Dobos in the amount of $1 each, with costs. The parties do not argue the propriety of Donna and Laura Dobos's participation in this appeal, and the defendants do not challenge the awards in their favor.

halt in the breakdown lane. Mancinelli provided his name, address, and the necessary registration and insurance information. He then stated that he wished to leave. Dobos's wife insisted that he stay until they could obtain police assistance. Dobos and his wife (plaintiffs) then attempted to contact the police, first by means of their own two-way radio, then by means of a cab driver's radio, and finally by motioning to a passing police cruiser. Approximately five to ten minutes after the accident, another cruiser, driven by Trooper Driscoll, arrived at the scene.

Trooper Driscoll obtained statements from Mancinelli and Dobos, but Dobos refused to sign Driscoll's transcription of his statement because he believed it to be inaccurate. Driscoll refused to amend the statement. Instead, he obtained a statement from Donna Dobos, which she signed. Driscoll returned to his cruiser briefly and wrote out citations charging both Mancinelli and Dobos with violations of laws governing the highways. Mancinelli then departed.

Upon handing Dobos his citation, Driscoll stated in a loud voice, "You are not the law. I am the law. You don't pull nobody off the road." Repeating the statement, Driscoll moved closer to Dobos until his saliva was spraying in Dobos's face. Driscoll also jabbed Dobos in the chest with his fingers. Dobos and his wife pleaded with Driscoll to stop, and Dobos put his hands up and said, "The children are watching. Please, Officer, your behavior will be difficult to explain. Don't scream." The plaintiffs' pleas had no effect. Dobos, who speaks broken English, then said, "I'm so sorry, Officer, I don't hear you." Driscoll said, "If you say that one more time, I'm going to lock you up." When Dobos did repeat himself, Driscoll took him by the arm, marched him to the cruiser, frisked him, handcuffed his hands tightly behind his back, and roughly forced him into the cruiser. Dobos asked if he could have his glasses and if he could give his keys to his wife. Driscoll did not respond and drove away at a high speed.

Dobos was taken to the Framingham State police barracks. Driscoll removed the handcuffs with some difficulty, apparently because they were fastened too tightly to Dobos's wrists.

Dobos was taken to a cell. Some time later, Dobos stated that he did not feel well and requested medical attention. According to Dobos's testimony, the following exchange then took place.

DRISCOLL: "What's wrong with you? Nothing wrong with you."

DOBOS: "I don't know what's wrong with me. I like to find out."

DRISCOLL: "I don't see anything wrong with you."
Dobos then gave his name and address and refused to say anything further. Dobos was informed that, unless he provided information necessary to be admitted to bail, he would be held in the cell overnight.

Shortly after these events, Donna Dobos arrived at the Framingham barracks. She encountered Driscoll and asked him why he had yelled at them. He responded, "That's the way I talk." When Donna Dobos asked why he had refused to state where he was taking Dobos and why he had left before she could follow, Driscoll responded, "It's not my job to play follow-the-leader." After some further exchanges between Driscoll and Donna Dobos, she was led to her husband's cell by Driscoll and the barracks commander, who then left her with her husband. She observed that he had been crying, that his hand was red and swollen, that his hand was shaking, and that he was pale. Dobos told his wife that he had requested medical help three times, and he asked her to request medical help for him again. She did so, and Driscoll responded, "We don't ask doctors to come here. If you insist on medical help we're going to send your husband to a mental hospital in a straitjacket if necessary for a minimum of ten days." Donna Dobos left the barracks in tears.

After Donna Dobos left the barracks, Driscoll came into Dobos's cell. Driscoll brought with him a sheet of paper containing the bail information provided by Donna Dobos, and, according to Dobos, began yelling that "[n]obody['s] yanking my chain. You s---. I show you, you don't go out so far you don't give me the information." Driscoll proceeded to tear apart the sheet of paper and to throw it before Dobos. Dobos began to sweat, his mouth became dry, and he asked Driscoll

for some water, which Driscoll provided. Dobos stated, "You don't see, I need medical help," and fainted. He was taken to a hospital and then returned to the barracks, by which time his wife had retained an attorney who obtained Dobos's release that night.

At trial Dobos presented testimony about his background and about the long-term effects of his encounter with Driscoll. Dobos was born in Budapest, Hungary. He was subject to physical abuse as a child, from his military father and others. When he was twenty-one years old, he was taken from his parents' home by the Hungarian secret police and placed in a Communist labor camp for three years. He was subject to physical and mental abuse in the labor camp.

Dobos came to the United States in 1967. From 1967 until 1978, Dobos established a successful business as a dental technician. He travelled extensively, both with his family on vacations and by himself, either for his own education or to give professional presentations. After his encounter with Driscoll, however, Dobos began to avoid interaction with anyone outside his family and began to avoid activities outside of his home. In 1980, Dobos sought the aid of a psychiatrist. Dobos received treatment occasionally until 1982, and, although he received medicine to alleviate his fear of going out of the house, Dobos felt that it made him irresponsible. In 1982, Dobos began to receive regular weekly treatments by a clinical psychologist, David Cellani.

Cellani testified that Dobos had received 106 one-hour sessions and that he expected these sessions to continue, although they had become progressively less regular by 1986.[4] He further testified that Dobos "clearly described being agoraphobic, that is, having fear of traveling freely and having fear, excessive fear of leaving his house. He described the fact that whenever he went out, that he would have one or more of his family members come with him." Cellani testified that Dobos had an "underlying psychological structure which could be called a

---

[4] Cellani testified that the charge for the 106 sessions was between $50 and $55 a session.

dependent personality disorder," but that Dobos's agoraphobia "did not appear until it was proven to him once again that even in this country, where he came to live, you could be beaten and humiliated" so that "those fears that were already in him were massively exacerbated by this incident [with Driscoll] and he became house-bound, more or less house-bound" for the eight years since the incident.

2. *Evidence against the supervisory defendants.* The defendant Robert Hunt testified that he was a troop commander with the State police from July, 1977, until after the Dobos incident. In this position, he was responsible for the administration and management of approximately 170 to 190 officers. Driscoll had been removed from highway patrol in November, 1976, but had returned to highway patrol under Hunt's command in October, 1977. Hunt testified that he was not aware of the specific reasons for Driscoll's discipline but admitted that it was "common knowledge" that Driscoll's captain had recommended that he "be removed from field operations and have no direct contact with the public."

Hunt also testified that, on receipt of civilian complaints, it was State police procedure to determine the seriousness of the allegations and to investigate the matter, whereupon the troop commander ordinarily would "make a judgment based on the information that was available to him." In extraordinary circumstances, he testified, the matter would be referred to the internal affairs department, which would make its own investigation and recommendation to the deputy superintendent.

Between the time that Driscoll was reassigned to highway duty under Hunt in October, 1977, and the Dobos incident in September, 1978, Hunt reprimanded Driscoll several times with respect to Driscoll's behavior toward motorists whom he had stopped on the highway. In all, he reprimanded Driscoll approximately five times for what Hunt characterized as "minor infractions." He testified that, during his command, there were two substantiated complaints against Driscoll that concerned incidents with motorists. Hunt recommended, in a written report to Canty in March, 1978, that no disciplinary action be taken on the first complaint, by one Robert W. Mitchell, be-

cause of the "unusual conditions." That complaint, known to Hunt, involved Driscoll's use of abusive language and threat of injury against Mitchell during the blizzard of 1978.

Mitchell testified with regard to this incident. He said that he had complained to two of Driscoll's supervisors at the Framingham barracks. Mitchell also testified that, when he attempted light conversation with a fellow passenger in Driscoll's cruiser, Driscoll pulled the cruiser over, opened the door beside Mitchell, and said, " 'Open your f------ mouth now,' and he had one of those case hardened flashlight[s] cocked behind his ear." Driscoll then yelled, screamed, and "seemed to be totally out of control . . . to the point that as he was yelling spittle was coming out." When Mitchell said nothing, Driscoll cocked the flashlight back again and demanded, "[A]re you going to keep your G--d----- mouth shut?" Mitchell said, "Yes," and they drove on in silence. These facts were included in the written report of this incident.

The second complaint was received in July, 1978, from one Monty Bender. The record does not indicate the nature of this complaint, but in response to it Hunt recommended, in December, 1978, that Driscoll be enrolled in an "attitude awareness program." Hunt testified that it was "common knowledge" that Driscoll's former captain had recommended in 1974 that Driscoll "be removed from field operations and have no direct contact with the public." Despite this knowledge, Hunt did not investigate Driscoll's disciplinary history. Hunt admitted that, when he later became aware of Driscoll's record, he expressed the opinion that Driscoll had not been fit to be on the highway on the date of his encounter with Dobos.

Dobos presented evidence of several incidents that Hunt might have discovered had he investigated Driscoll's disciplinary history. In 1974, because of prior incidents, Charles Gilligan, Driscoll's commanding officer, had recommended in writing that Driscoll be assigned permanently to desk duty. Other testimony, given by a Norman Gans, was that he had complained orally about Driscoll in 1974 and had been assured by one of Driscoll's superiors that Driscoll "would not be on the road." Gans had complained of harassment and of being de-

tained for twenty minutes by Driscoll for speeding, despite having explained that he would accept a ticket but needed to get to the hospital quickly because his wife had had emergency surgery.

Dobos presented testimony that Driscoll had been removed from highway duty from February, 1975, to May, 1976. At that time, Driscoll was subject to numerous probationary conditions, approved by the Commissioner of Public Safety, John F. Kehoe, Jr., including provisions for evaluation every thirty days, the continuation of any medical treatment he was receiving, and the requirement of medical evaluations before he could be returned to highway duty. This discipline had been imposed in response to a substantiated complaint by Driscoll's girl friend that he had assaulted her and her children.

While Driscoll was removed from highway duty this first time, he had worked on a "paid detail" at Shaeffer Stadium. In September, 1974, while at work as a guard, Driscoll responded to a radioed request by another trooper for jumper cables by driving "in an emergency fashion" the wrong way on a one-way street, and, when a police captain observed him and inspected his vehicle, the captain found "unauthorized equipment," including blue police lights in the windows of his automobile, bulletproof clipboards and vests, and at least seventeen rounds of ammunition. In his written report, the captain characterized Driscoll's "total lack of judgment" as a "threat to the lives and safety of the traffic and pedestrians and our own men in the field."

The defendant James Canty was a lieutenant colonel of the State police from June or August, 1977, until after the Dobos incident. He was in charge of assigning, disciplining, and supervising all of the uniformed State police officers on highway duty in the Commonwealth. Canty testified that, at the time that Driscoll returned to road duty under his command, he was not aware that Driscoll had been taken off the road previously. He testified that, prior to Dobos's complaint, he was aware of Mitchell's and Bender's complaints in 1978 but was unaware of any other incidents involving Driscoll. He also testified that he and the defendant Hunt "agreed on disciplinary

action" concerning Mitchell's complaint and that the punishment "was supposed to be a verbal reprimand." Finally, he testified that, like Hunt, he did not investigate Driscoll's disciplinary history.

The defendant Frank J. Trabucco was a colonel in the State police from June, 1977, until after the Dobos incident. He testified that it was his responsibility, in that position, to bring Driscoll's request in 1977 for a transfer back to a road position to the Commissioner of Public Safety for approval, and to "do[ ] the administrative aspect of it." He further testified that, to his knowledge, the reasons for Driscoll's removal from highway duty from November, 1976, to October, 1977, were his tardiness and some inappropriate log entries. However, he also testified that he was aware that Driscoll had disciplinary problems, had been taken off the road twice before, had been reassigned so that he had no public contact, and had not been allowed to drive to work in a cruiser. Trabucco also knew that Driscoll's captain had recommended, prior to November, 1976, that Driscoll should be put in a position where he would have less contact with the public. Trabucco presented Driscoll's request to be reinstated to highway duty, without investigating whether Driscoll should have been put back on the road, to the Commissioner of Public Safety for approval. In justification of this conduct, Trabucco stated that Driscoll had been told, prior to Trabucco's tenure, that he would be punished by six months off the road, and he had, in fact, been off the road more than six months. At another point, however, Trabucco had testified that "the understanding [was] that it would be for a minimum of six months."

The defendant John F. Kehoe, Jr., was Commissioner of Public Safety from August, 1971, to August 1978, one month prior to the Dobos incident. He testified that he was aware of Driscoll's disciplinary problem, that Driscoll was ordered to undergo psychiatric treatment, that Driscoll had been removed from road duty twice, and that Driscoll had been the subject of a court-martial in connection with an assault by him of his girl friend, which resulted in Driscoll's removal from road duty, and that Kehoe was aware of the stadium incident. Kehoe testified that he had removed Driscoll from road duty in Febru-

ary, 1975, in response to the substantiated complaint by Driscoll's girl friend that Driscoll had abused her and her children. He did so subject to strict probationary conditions, in accordance with the recommendations of a court-martial board that was convened pursuant to his order. Kehoe was also responsible for removing Driscoll from highway duty the second time, and for returning him to highway duty on Trabucco's recommendation. Kehoe reinstated Driscoll by means of an order that the defendant Trabucco described as "[n]ot usual" because "[t]here was nobody else on the order."

3. *Denial of Driscoll's motions for a separate trial and for a mistrial.* Driscoll challenges the judge's refusal to grant him a separate trial from that of his supervisors and the Commonwealth. Motions for a separate trial are governed by Mass. R. Civ. P. 42 (b), 365 Mass. 805 (1974), which provides in part:

> "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial . . . ."

See *Roddy & McNulty Ins. Agency* v. *A.A. Proctor & Co.*, 16 Mass. App. Ct. 525, 528 (1983) (discussion of rule 42 [b]). Driscoll moved for a separate trial because of prejudice from the anticipated admission in evidence of documents and testimony concerning his prior misconduct, as it might be relevant to his supervisors' alleged failure to supervise. Driscoll moved for a mistrial at several points on the same ground. Driscoll does not claim that this evidence was admitted improperly against his supervisors and the Commonwealth; nor does Driscoll claim that the judge failed to give proper cautionary instructions. However, he claims now, as he did before the trial judge, that his prior misconduct was inadmissible against him and that no possible cautionary instruction would remove the prejudice and the stigma of evidence of his prior misconduct.

Driscoll points to no case in this Commonwealth in which the decision of a judge not to bifurcate a civil proceeding has been the ground for reversal. Furthermore, Driscoll has cited no such

reversal by any other jurisdiction. The matter is one within the sound discretion of the trial judge. See *Roddy & McNulty Ins. Agency* v. *A.A. Proctor & Co., supra* at 529. We recognize that there may be civil cases in which the refusal to grant separate trials would so prejudice a party that reversal is mandated. This is not such a case. The evidence admissible against Driscoll was strong, if not overwhelming. He points to no fact which would lead us to conclude that the jury did not abide by the judge's cautionary instructions. See *Harris* v. *Chanclor*, 537 F.2d 203, 207 (5th Cir. 1976) (rejecting defendant police officer's claim of prejudice by being tried with police chief, where evidence of officer's propensity for violence was admitted to establish chief's negligence in hiring and retaining officer).

Driscoll also made various motions for a mistrial as the evidence was admitted; all were denied. In denying the pretrial motion for a separate trial, the judge stated, "I can't see any theory under which [Driscoll's prior records] would be admissible against [Driscoll]. . . . [But] [i]n terms of the supervisory defendants, I would see these prior actions of [Driscoll] as being admissible on the matter of their knowledge. . . ." This said, during the trial, the judge gave appropriate and timely instructions whenever requested. There was no error. "The declaration of a mistrial is within the sound judicial discretion of the trial judge." *Riley* v. *Davison Constr. Co.* 381 Mass. 432, 444 (1980).[5]

4. *Immunity of the supervisors and of the Commonwealth.* The supervisors and the Commonwealth raise several claims of immunity. The supervisors rely on Federal law to assert that they are entitled to qualified or "good faith" immunity under 42 U.S.C. § 1983 (1979), as amended. The Commonwealth's claims of immunity are based on G. L. c. 258, §§ 10 (*b*) and (*c*). We treat these claims separately.

---

[5] In this context we need not address the argument of the plaintiffs that evidence of Driscoll's prior misconduct was admissible against him as an exception to the general rule of exclusion (res inter alios acta). See P.J. Liacos, Massachusetts Evidence 426 (5th ed. 1981 & Supp. 1985).

a. *Qualified immunity pursuant to § 1983.* Under *Harlow* v. *Fitzgerald,* 457 U.S. 800, 818 (1982), the doctrine of qualified immunity applies only to "discretionary functions." For this portion of our discussion, we shall assume that the supervisory defendants' acts were discretionary acts.[6] Contrast *Breault* v. *Chairman of the Bd. of Fire Comm' rs of Springfield,* 401 Mass. 26, 33 (1987) (where acts are ministerial, no valid claim of qualified immunity can be raised), cert. denied sub nom. *Forastiere* v. *Breault,* 485 U.S. 906 (1988). Such an assumption does not end our inquiry. The doctrine of qualified immunity has both an objective and a subjective element. "The objective element involves a presumptive knowledge of the respect for 'basic, unquestioned constitutional rights.'" *Harlow, supra* at 815, quoting *Wood* v. *Strickland,* 420 U.S. 308, 322 (1975). The subjective element involves the supervisors' actual knowledge whether the law forbade their conduct. *Harlow, supra* at 815-817. If the law was not clearly established, the supervisors cannot be held responsible for failing to know that their conduct was unlawful. *Id.* at 818. However, if the law was clearly established and the supervisors failed to prove extraordinary circumstances justifying their lack of knowledge of the law, then the immunity defense fails. "[A] reasonably competent public official should know the law governing his conduct." *Id.* at 819. Whether the law was clearly established is an objective question for the judge. *Id.* at 818.

The supervisory defendants raised the issue below, and, hence, we consider whether the judge correctly determined that the relevant law was clearly established prior to Dobos's arrest in September, 1978. In considering what law is relevant, we bear in mind that:

"The operation of [the *Harlow*] standard . . . depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified. For example, the right to due process of law is quite clearly established

---

[6] We make this assumption, arguendo, under Federal law only. We discuss whether the acts were discretionary under G. L. c. 258, § 10 (*b*), *infra,* and conclude they were not.

by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*. . . . It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of preexisting law the unlawfulness must be apparent"* (emphasis supplied). *Anderson* v. *Creighton*, 483 U.S. 635, 639-640 (1987).[7]


Thus, the law must have been clearly established prior to September, 1978, that conduct by public officers, comparable to the conduct of the police supervisors in this case resulting in the infliction of injuries by a subordinate, violated the constitutional rights of the injured individuals. We hold that, during the tenure of each of the supervisors, such law was clearly

---

[7] The First Circuit Court of Appeals has stated this principle in these words:

"In making this determination, we need not find a ruling that considered the precise situation at hand. It is enough, rather, that there existed case law sufficient to clearly establish that, if a court *were* presented with such a situation, the court would find that plaintiffs' rights were violated. See *King* v. *Higgins*, 702 F.2d 18, 20 (1st Cir. 1983) [, cert. denied sub nom. *Vinzant* v. *King*, 464 U.S. 965 (1983)]." (Emphasis in original.) *Hall* v. *Ochs*, 817 F.2d 920, 924-925 (1st Cir. 1987).

established. We hold, also, that the evidence placed before the jury was sufficient to warrant the jury's verdicts. (See part 6, *infra.*)

In 1971, well before the first occasion on which Driscoll was removed from highway patrol, the United States Court of Appeals for the District of Columbia Circuit decided a case concerning police supervisory liability. In that case, *Carter* v. *Carlson*, 447 F.2d 358 (D.C. Cir. 1971), rev'd on other grounds sub nom. *District of Columbia* v. *Carter*, 409 U.S. 418, modified, 489 F.2d 1272 (D.C. Cir. 1973), the complaint alleged that a police officer had arrested the plaintiff without probable cause and, as he was being held by two other officers, the first officer had proceeded to beat him with brass knuckles. *Id.* at 360. The complaint further alleged that the first officer's precinct captain and the chief of police had "negligently failed to train, instruct, supervise, and control [the officer] with regard to the circumstances in which (1) an arrest may be made, and (2) various degrees of force may be used in making an arrest." *Id.* The court in that case held that, under § 1983, the plaintiff "will be entitled to prevail if he can show that [the] Captain . . . or Chief . . . was negligent in performing his own duty to supervise or train [the officer] . . . and that the negligence caused [the plaintiff] to be deprived by [the officer] of his constitutional rights." *Id.* at 365. The *Carter* court also stated that supervisors might well be liable if the plaintiff could show that they "knew, or should have known, that [the officer] was likely to use excessive force in making an arrest." *Id.* at 364 n.13.

The conduct of the supervisors herein meets this description exactly. Dobos presented ample evidence that the supervisors knew, of should have known, that Driscoll was very likely to violate constitutionally protected rights of members of the public. Driscoll's extensive history of abuse and assault, and his disregard of the rights of others, was unabated until his encounter with Dobos. The supervisory defendants knew, or should have known, that Driscoll had assaulted his former girl friend and her children; he had endangered the public and his fellow officers by his reckless driving while at Shaeffer Stadium,

and by his possession of unauthorized ammunition and bullet-proof vests and clipboards, even though he was removed from road duty at the time; he had harassed Norman Gans; he had verbally abused Mitchell and had twice threatened to strike him, with no apparent provocation; and he had abused Bender sufficiently that Hunt, who had recommended no action on the Mitchell complaint, recommended that Driscoll be enrolled in an attitude awareness program. Additionally, it was known that Driscoll's history had prompted several of his former supervisors to recommend his removal from contact with the public. The supervisors herein knew, or should have known, of this extensive disciplinary history because each of them had disciplined Driscoll at least once, and the defendants Hunt and Kehoe testified that disciplinary action required a complete investigation of the officer's history. "[A] complaint alleging that a police supervisor has notice of past culpable conduct of his subordinates and has failed to prevent a recurrence of such misconduct states a § 1983 claim." *Sims* v. *Adams*, 537 F.2d 829, 832 (5th Cir. 1976).

Other Federal Circuit Courts were in agreement that supervisors could be held liable in similar circumstances.[8] See, e.g., *Roberts* v. *Williams*, 456 F.2d 819, 830-831 (5th Cir.), cert. denied sub nom. *Roberts* v. *Smith*, 404 U.S. 866 (1971) (allegedly negligent training of guard at prison farm); *Dewell* v. *Lawson*, 489 F.2d 877, 881 (10th Cir. 1974) (police chief's alleged failure to establish procedures or to provide personnel to detect and treat persons suffering from a diabetic condition); *Sims* v. *Adams, supra* (police supervisors who have notice of

---

[8] The dissent relies, in part, on *Delaney* v. *Dias*, 415 F. Supp. 1351, 1353 (D. Mass. 1976). In that case, the plaintiffs did not allege any "personal involvement" by the supervisors therein. Indeed, in *Delaney*, the court stated:

"This court's conclusion might well be different if there were an allegation that the defendant had some contact with the events at issue . . . . [T]here must be an allegation of, at least, some participation or acquiescence — express or otherwise — in the constitutional deprivations complained of." *Id*. at 1354.

past culpable conduct of subordinates and have failed to prevent recurrence of such misconduct may be liable under § 1983). The above cases clearly established, prior to 1978, that Driscoll's supervisors could be liable under § 1983 for their failure to remove him from highway duty prior to his encounter with Dobos.[9]

b. *Immunity for the Commonwealth: State law.* The Commonwealth contends that the judge erred in denying its motion for a directed verdict and for judgment notwithstanding the verdict as to the claims against it under G. L. c. 258. Under G. L. c. 258, the Massachusetts Tort Claims Act, the Commonwealth "shall be liable for . . . personal injury . . . caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances," subject to certain limitations. G. L. c. 258, § 2 (1986 ed.). The Commonwealth claims that this case falls within an exemption from such liability for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." G. L. c. 258, § 10 (*b*) (1986 ed.). We consider this argument in the context of the well-established principle whether, construing the evidence and all reasonable inferences flowing therefrom in a light most favorable to the plaintiff, a jury would be warranted in finding that the Commonwealth's agents were negligent in their performance of nondiscretionary duties. *von Henneberg* v. *Generazio*, 403 Mass. 519, 520 (1988). *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 326 (1982).

The Commonwealth urges that, as matter of law, the decisions whether to discipline an officer and how much discipline to impose are discretionary, and in fact quasi-judicial. We

---

[9] The dissent attempts to distinguish the pre-1978 cases on the basis that they did not come to judgment but merely established that the plaintiffs therein had stated a claim. The Court in *Anderson* v. *Creighton, supra*, rejected a requirement of a prior judgment establishing the acts as unlawful.

disagree. We have indicated previously that it is necessary to engage in a case-by-case determination of what is a discretionary function under § 10 (*b*) and what is not. *Pina* v. *Commonwealth*, 400 Mass. 408, 413 (1987). We hold, on the evidence before them, that the jury were warranted in finding that the supervisors' acts, or failures to act, were not pursuant to any "discretionary function" within the meaning of G. L. c. 258, § 10 (*b*).

We have stated that the following inquiries are relevant as to whether the act of a public employee involved discretionary conduct: "Was the injury-producing conduct an integral part of governmental policymaking or planning? Might the imposition of tort liability jeopardize the quality and efficiency of the governmental process? Could a judge or jury review the conduct in question without usurping the power and responsibility of the legislative or executive branches? Is there an alternate remedy available to the injured individual other than an action for damages?" *Whitney* v. *Worcester*, 373 Mass. 208, 219 (1977). See *Pina* v. *Commonwealth, supra* at 412-413, and cases cited. We consider first whether the injury-producing conduct was an integral part of governmental policymaking or planning.

The supervisors' alleged injury-producing conduct may be characterized as follows: The reinstatement of Driscoll to highway patrol despite the supervisors' knowledge (actual or constructive) of ample reasons for not doing so, the failure to follow established procedures resulting in failing to impose probationary conditions on Driscoll's return to highway patrol that would have assured his removal prior to his encounter with the plaintiffs, the failure to monitor Driscoll's activities, and the failure to remove Driscoll, or to investigate his record, as various substantiated allegations of his misconduct arose.

In *Whitney* v. *Worcester, supra*, we held that, although the adoption of a plan to integrate handicapped pupils fully into the public schools was discretionary, *id.* at 224, the implementation of that policy was not, *id.* at 222-223. "Discretionary acts are not those which involve 'the carrying out of previously established policies or plans.' *Whitney* v. *Worcester, supra* at

218. *Irwin* v. *Ware,* [392 Mass. 745, 753 (1984)]." *Patrazza*
v. *Commonwealth,* 398 Mass. 464, 467-468 (1986). The evi-
dence put before the jury was sufficient to warrant a finding
that the supervisory defendants failed to implement existing
policy requirements.[10] It was State police policy, the defendant
Kehoe admitted, to conduct a thorough investigation in re-
sponse to citizen complaints and in conjunction with imposing
discipline. Yet, all the supervisors admitted that they conducted
no investigation of Driscoll's disciplinary history, either when
disciplining him or after receiving citizen complaints against
him. Furthermore, the jury had before them several of Dris-
coll's prior disciplinary proceedings from which established
policies could be inferred. It is not necessary that a policy be
written to be in effect. *Cady* v. *Plymouth-Carver Regional
School Dist.,* 17 Mass. App. Ct. 211, 215 (1983). Finally,
there was testimony that Driscoll's reinstatement without pro-
bationary conditions was unusual. Thus, the jury could have
found that the supervisors' conduct in reinstating Driscoll was
an improper implementation of existing policy.[11]

---

[10] This is not a case, like *Narine* v. *Powers,* 400 Mass. 343 (1987), in
which there was no evidence of any established procedure or policy. *Id.* at
347 (isolated and apparently unprecedented bomb threat, as to which there
was no customary policy).

[11] The dissent cites *Cady* v. *Plymouth-Carver Regional School Dist.,*
*supra,* for the proposition that the conduct of the supervisors herein was
discretionary because it was related to disciplinary action. The dissent mis-
reads *Cady.* The *Cady* court stated:

"If the public employee is required to decide and act without fixed
or readily ascertainable standards to fall back upon, that act is a
discretionary function. . . . That the discretion conferred may have
been abused is of no matter. It is the nature of the governmental act,
not the care with which it is performed, that determines whether the
exception applies. . . . *Conversely, if there is a readily ascertainable
standard by which the action of the government servant may be
measured,* whether that standard is written or the product of experi-
ence, *it is not within the discretionary function exception.* . . . It
requires no manual, for example, to instruct an installer of street
lights in Boston that the wind may blow mightily and that lightposts
had better be anchored accordingly." (Emphasis supplied and citations
omitted.) *Cady* v. *Plymouth-Carver Regional School Dist., supra* at
215.

Additionally, we cannot say that the imposition of tort liability in this case will jeopardize the quality and efficiency of the governmental process. There was testimony by some of the supervisors suggesting that Driscoll's position as a negotiator for his union may have led them to treat Driscoll differently from other officers. As we stated in *Pina* v. *Commonwealth, supra* at 413, the " 'quality and efficiency of the governmental process' requires, at a minimum, impartiality on the part of State employees." The imposition of tort liability in this case will, if anything, encourage such impartiality.

The power and responsibility of the legislative and executive branches are not usurped in this case. There is no administrative scheme that is being bypassed, cf. *Pina* v. *Commonwealth, supra* at 413-414; nor is there any interference with the operation of police disciplinary policy or procedures. Rather, it is the failure to follow established procedures that was tested by the jury.

Finally, the plaintiffs have no alternate remedy other than an action for damages. They have no alternate judicial process, as in *Pina* v. *Commonwealth, supra* at 414; they cannot be aided by equitable relief; and, absent damages, they cannot be compensated for the harm done. Therefore, the Commonwealth does not have immunity under G. L. c. 258, § 10 (*b*), based on a claim of the exercise of discretionary functions by the supervisors.

The Commonwealth claims, alternatively, that it falls within the exemption from liability for "any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, [or] intentional mental distress." G. L. c. 258, § 10 (*c*). The Commonwealth asserts that the plaintiffs raise claims "arising out of" intentional torts because of Driscoll's intentional torts. We already have considered and rejected such an interpretation of G. L. c. 258, § 10 (*c*). *Doe* v. *Blandford*, 402 Mass. 831, 836-838 (1988). As we held in *Blandford*, where the supervisory officials allegedly had, or should have had, knowledge of a public employee's assaultive behavior, it is the supervisors' conduct, rather than the employee's intentional conduct, that is the true focus of the case. The claims were not barred by G. L. c. 258, § 10 (*c*).

5. *Jury instructions.* Counsel for the supervisors submitted requests for jury instructions and made timely objection to the judge's charge. As to the charge, the supervisors renew their claims of error on essentially two grounds. First, they claim that an instruction should have been given that, under § 1983, the supervisors could not be held liable on the basis of respondeat superior. Second, they claim that the jury were not adequately apprised that "mere negligence" would not suffice to find the supervisors to be liable under § 1983. See *Davidson v. Cannon*, 474 U.S. 344, 347 (1986); *Daniels v. Williams*, 474 U.S. 327, 332-336 (1986). These arguments are not supported by the record.

The judge instructed the jury as follows:

> "If you find on this evidence that any or all of the defendants failed to supervise or discipline Driscoll, and said failure to supervise or discipline him constituted gross negligence *amounting to conscious indifference to the safety of the public*, and that this resulted in the violation of Robert Dobos's constitutional rights, then you should find that they are liable to Mr. Dobos" (emphasis supplied).

This charge tracks the language used by the Fifth Circuit in *Languirand v. Hayden*, 717 F.2d 220, 227 (5th Cir. 1983), cert. denied sub nom. *Languirand v. Pass Christian*, 467 U.S. 1215 (1985), wherein that court stated:

> "We conclude that if there is a cause of action under section 1983 for failure to properly train a police officer whose negligent or grossly negligent performance of duty has injured a citizen, that such failure to train must constitute gross negligence amounting to conscious indifference . . . ."

This language was implicitly approved by the Supreme Court in its recent decision in *Canton v. Harris*,     U.S.     (1989) (109 S. Ct. 1197 [1989]), which concerned municipal liability for failure to train police officers. In a unanimous portion of

the opinion, the Court cited *Languirand* as an example of a case applying the proper standard of liability under § 1983. *Id.* at     n.7 (*Id.* at 1205 n.7).[12] See *Germany* v. *Vance*, 868 F.2d 9, 17-18 (1st Cir. 1989), where the court stated: "Cases in this circuit suggest that government officials may be held liable for a deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights." Thus, the judge's charge fully complies with the latest Supreme Court precedent. We must assume that the jury followed these instructions. *Simon* v. *Solomon*, 385 Mass. 91, 110 (1982). The judge was not required to accept the phrasing of the instructions suggested by counsel. *Julian* v. *Randazzo*, 380 Mass. 391, 394-397 (1980). There was no error.

The supervisors also contend that the special questions suggested to the jury that "mere negligence" would suffice. It is true that the special questions did not refer explicitly to gross negligence amounting to conscious indifference. However, the judge is not required to repeat in the special questions those instructions given at an earlier point in the charge. See *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 802 (1987) (special questions did not specifically refer to issue of proximate cause, but judge's thorough instructions on this issue enabled jury to understand their duty in answering each question).

The jury's question to the judge about the meaning of the words "causally negligent" in one of the special questions does not convince us otherwise. There are many reasons why the jury may have asked their question, not the least of which is that one special question addressed the contributory negligence,

---

[12] The Court cited the *Languirand* language as an example of the "common rule" that "a city must exhibit 'deliberate indifference' towards the constitutional rights of persons in its domain before a § 1983 action for 'failure to train' is permissible." *Canton, supra* at     n.7 (*supra* at 1205 n.7). The Court's use of the phrase "deliberate indifference" as a synonym for "gross negligence amounting to conscious indifference" is a reflection of the variety of synonymous phrases used by lower courts to express the standard of liability after the Court's decisions in *Daniels* and *Davidson*, both *supra*. See, e.g., *Voutour* v. *Vitale*, 761 F.2d 812, 820, 823 (1st Cir. 1985), cert. denied sub nom. *Saugus* v. *Voutour*, 474 U.S. 1100 (1986) (using terms interchangeably).

if any, of Dobos. We will not speculate that the jury were in fact confused about the distinction between ordinary negligence and gross negligence amounting to conscious indifference when that distinction had been explained previously.

Finally, the supervisors contend that, because the judge's response to the jury's question failed to mention gross negligence amounting to conscious indifference, it compounded any confusion that the jury may have had about the standard of culpability. This contention is speculative, and, in any event, there was no objection at trial, even though the judge asked counsel if they wished to discuss anything at side bar. There was no error.

6. *Motions for directed verdict and for judgments notwithstanding the verdict.* The defendant supervisors claim that the judge should have granted their motions for a directed verdict or for a judgment notwithstanding the verdict because the evidence was insufficient to support a finding either that they were consciously or deliberately indifferent to the safety of the public or that they proximately caused the plaintiffs' injuries. We apply the same standard in reviewing the judge's denial of these motions. *Service Publications, Inc.* v. *Goverman,* 396 Mass. 567, 571 (1986). That standard is whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.,* 361 Mass. 341, 343 (1972). We conclude that the jury properly could have found that each of the supervisory defendants (a) was consciously or deliberately indifferent to the safety of the public and (b) proximately caused the plaintiffs' injuries.

In the case before us, there was evidence that each supervisor — Hunt, Trabucco, Kehoe, and Canty — knew, or should have known, that Driscoll's disciplinary history would determine his fitness to come in contact with members of the public. Furthermore, there was evidence that the State police had a policy of investigating an officer's history before imposing discipline, in part to protect the public from officers whose his-

tory might reveal serious misconduct demonstrating a propensity to violate the constitutional rights of members of the public. Thus, the need to investigate Driscoll's history, and to determine whether to reinstate Driscoll to road duty or what training or conditions should be imposed on him, based on that history, can be said to be so obvious that failure to do so could be found by the jury to constitute deliberate indifference to the constitutional rights of members of the public with whom Driscoll would come in contact.

The defendant Hunt testified that he did not investigate the reasons for Driscoll's removal from highway duty, even though he disciplined Driscoll on at least five occasions, and even though he knew that Driscoll's former troop supervisor had recommended that Driscoll be removed from contact with the public. The defendant Trabucco also testified that he did not investigate the reasons for Driscoll's removal from highway duty, even though he recommended that Driscoll be returned to highway duty, and even though he knew that several of Driscoll's former supervisors had recommended that Driscoll be removed from public contact. The jury could find that the defendants Hunt and Trabucco chose to ignore Driscoll's history, even though they knew that his history was almost certain to reveal grave misconduct that threatened the public. Thus, the jury could conclude, Hunt and Trabucco each were deliberately indifferent to the constitutional rights of the public.

The jury could find that the defendant Kehoe chose to ignore Driscoll's history and, consequently, Driscoll's substantial likelihood of violating constitutional rights of the public. Kehoe's testimony revealed that he was involved personally in Driscoll's discipline, that he had removed Driscoll from public contact on two occasions, and that he had been informed that, even while Driscoll was removed from the highway under strict probationary conditions, Driscoll had endangered the public and his fellow officers at Shaeffer Stadium. Thus, Kehoe knew that Driscoll was violent and abusive and that Driscoll had responded to discipline with more misconduct. Yet Kehoe never investigated Driscoll's history, he returned Driscoll to highway duty a second time without requiring that Driscoll be

monitored, and he failed to impose any probationary conditions. On this evidence, the jury properly could find that Kehoe was deliberately indifferent to the constitutional rights of the public.

Finally, the jury could find that the defendant Canty deliberately chose to ignore Driscoll's history, even though he decided with Hunt what would be Driscoll's discipline for the Mitchell incident, and, even though his primary responsibility, the jury could infer, was to conduct investigations in cases of this sort. Canty described his responsibilities as follows: "I handled major incidents, discipline, make recommendations to the colonel." Canty testified that he and Hunt agreed that Driscoll's discipline for the Mitchell incident would be a "verbal reprimand." Nevertheless, when Canty was asked, "Did you ever learn of a complaint lodged against Trooper Driscoll on March 14, 1978 by Robert W. Mitchell," he responded, "I didn't know his name was Mitchell until today." The jury properly could conclude that this conduct, by a supervisor whose primary responsibility was to recommend disciplinary action after an investigation, was deliberately indifferent to the constitutional rights of the public.

It is clear that the jury could have concluded that each of the supervisory defendants knew, or should have known, of Driscoll's propensities to abuse and assault members of the motoring public and that, deliberately indifferent to the public safety, they allowed Driscoll to return to highway duty without proper investigation or safeguards. The probability of an incident such as that here in issue, in the jury's view, could have been foreseen easily. In such circumstances, the failure of these supervisory defendants to take steps to prevent such an occurrence would warrant the jury's findings of liability under § 1983 as to each supervisory defendant. Also, their negligence warrants the finding against the Commonwealth.[13] We therefore

---

[13] The verdict for the plaintiffs against the Commonwealth was reduced from $400,000 to the $100,000 statutory cap. G. L. c. 258. As to the claim of Driscoll and the other individual defendants that the verdict was excessive and should be reduced, our review of the record and of comparable cases reveals this claim to be without merit.

affirm the judgments and remand the case so that the judge below, in his or her discretion, may award attorney's fees and costs for this appeal.*

*So ordered.*

LYNCH, J. (dissenting in part, with whom Nolan and O'Connor, JJ., join). I agree with the court that the trial judge did not err in denying Driscoll's motions for a separate trial and for a mistrial. However, because I conclude that: the supervisory defendants were immune from suit under Federal law for the acts complained of; the Commonwealth is immune under G. L. c. 258, § 10 (*b*) (1986 ed.); and the evidence was insufficient to prove that the supervisory defendants were either reckless or callously indifferent to Dobos's rights, I respectfully dissent.

1. *Qualified immunity under § 1983.* The court concludes that the supervisory defendants were properly denied qualified immunity under 42 U.S.C. § 1983 (Supp. III 1979), because, even if disciplining a subordinate officer is a discretionary act, the cases cited clearly established, prior to 1978, that Driscoll's supervisors could be liable under § 1983 for their own conduct that resulted in constitutional violations by him. *Ante* at 646-650. The court misapplies the "clearly established" test because that test depends "substantially upon the level of generality at which the relevant 'legal rule' is . . . identified." *Anderson* v. *Creighton*, 483 U.S. 635, 639 (1987). "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense." *Id.*[1]

---

*The plaintiffs requested such fees and costs in their brief and in their petition for rehearing. The defendants have not challenged the trial judge's award, made concurrent with the date judgments were entered, of costs and of attorney's fees in the amount of $35,000 as of that date.

[1] The Supreme Court also stated that, if the parties could characterize the relevant legal rule in very general terms, they "would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson* v. *Creighton, supra* at 639.

What is required by *Anderson* v. *Creighton, supra,* therefore, is a consideration whether it was clearly established that imposition of an insufficient degree of discipline would constitute a violation of the plaintiffs' rights. Considered in this light it is clear that the action of any of the supervisors was not particularized enough to give rise to liability. At the time of events complained of, no case had established liability for a supervisor's inadequate response as contrasted with failure to act at all. Neither the court nor Dobos points to any decision imposing liability for failure to impose a greater degree of discipline. This is so, I submit, because a decision to impose discipline can, by its very nature, only be made on a case-by-case basis. In addition, disciplinary procedures must not violate an officer's due process rights. See *O'Hara* v. *Commissioner of Pub. Safety,* 367 Mass. 376, 382-384 (1975). Moreover, determining the appropriate punishment would seem to require assessing an officer's entire service record and taking into account not only the officer's prior meritorious acts but also the officer's prior blameworthy acts.

In *Benson* v. *Allphin,* 786 F.2d 268, 276 (7th Cir.), cert. denied, 479 U.S. 848 (1986), in discussing a State employer's qualified immunity defense, the court stated that courts have to balance the employer's and employee's competing interests and "[i]t would appear that, whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under [*Harlow* v. *Fitzgerald,* 457 U.S. 800 (1982)]." See *Warner* v. *Grahm,* 845 F.2d 179, 183 (8th Cir. 1988). But see *Moore* v. *Tri-City Hosp. Auth.,* 696 F. Supp. 1496, 1503-1505 (N.D. Ga. 1988). The supervisory defendants in this case had to consider not only that the public's civil rights should be protected, but also that Trooper Driscoll receive only that degree of discipline that his misconduct warranted.

The decisions cited by the court do not establish that the defendants would be liable in this context. In *Carter* v. *Carlson,* 447 F.2d 358 (D.C. Cir. 1971), rev'd on other grounds sub nom. *District of Columbia* v. *Carter,* 409 U.S. 418, modified,

489 F.2d 1272 (D.C. Cir. 1973), on which the court relies heavily, the United States Court of Appeals for the District of Columbia Circuit did not reach the merits of the plaintiff's claim, but simply reversed the dismissal of the complaint for failure to state a claim. Furthermore, the *Carter* decision took account of the fact that the Supreme Court had not yet read into § 1983 a broad immunity "for all government officers exercising discretionary functions." *Id.* at 365. Subsequently, and prior to the acts complained of here, the Supreme Court decided that qualified immunity exists for government officials other than legislators and judges. *Procunier* v. *Navarette*, 434 U.S. 555 (1978) (prison officials). *Wood* v. *Strickland*, 420 U.S. 308 (1975) (school officials). *Scheuer* v. *Rhodes*, 416 U.S. 232 (1974) (State executive branch officials). Even if *Carter* can be construed as giving notice to law enforcement officials regarding their potential § 1983 liability, the *Procunier*, *Wood*, *Scheuer* expansion of the governmental qualified immunity defense certainly pointed in the opposite direction. The *Carter* case also predates the Supreme Court's decision in *Rizzo* v. *Goode*, 423 U.S. 362 (1976), and thus any value it may have had in determining a supervisor's potential § 1983 liability was virtually eliminated by the Court's holding that a mere "failure to act" on the part of supervisory officials in the face of constitutional violations by subordinate officers is not a sufficient basis for establishing § 1983 liability. *Id.* at 375-376. See *Hays* v. *Jefferson County*, 668 F.2d 869, 873 & n.2 (6th Cir.), cert. denied, 459 U.S. 833 (1982) (recognizing the limited value of *Carter* v. *Carlson* in light of *Rizzo* v. *Goode*).

    *Roberts* v. *Williams*, 456 F.2d 819 (5th Cir.), cert. denied sub nom. *Roberts* v. *Smith*, 404 U.S. 866 (1971), also fails to support the liability of the supervisory defendants in this case. In *Roberts*, the liability of the prison farm superintendent for failing to train and supervise a guard rested on the superintendent's total failure to provide any training to the guard concerning the proper handling of the firearm entrusted to him. *Id.* at 822-823. *Roberts* offered supervisory officials no guidance as to their potential liability should the amount of training and supervision provided ultimately prove to be inadequate.

*Dewell* v. *Lawson*, 489 F.2d 877 (10th Cir. 1974), and *Sims* v. *Adams*, 537 F.2d 829 (5th Cir. 1976), decided prior to *Anderson* v. *Creighton, supra,* also fail to provide a basis for concluding that supervisory liability exists here. In both cases, the courts merely reversed trial court decisions dismissing complaints for failure to state a claim. In addition, unlike this case, the plaintiffs in both *Dewell* and *Sims* alleged a total failure by police officials to take action, e.g., *Dewell, supra* at 880 (failure to establish regulations regarding diabetic prisoners); *Sims, supra* at 831-832 (failure to discipline subordinate officer). Even assuming these cases establish that police supervisors may be liable under § 1983 for their failure to act when they had a duty to do so, the cases do not clearly establish the incorrectness of the defendant supervisors' conduct here. As the Supreme Court has stated, officials are not "charged with predicting the future course of . . . [the] law." *Pierson* v. *Ray*, 386 U.S. 547, 557 (1967).

Moreover, I am led to the conclusion in favor of the supervisors' immunity because at the time of these events supervisory officials were not clearly liable for failing to supervise their subordinates. See, e.g., *Rizzo* v. *Goode, supra* at 375-376; *Kostka* v. *Hogg*, 560 F.2d 37, 40 (1st Cir. 1977) ("[a] police chief is under no constitutional duty to take positive action to reduce the incidence of unconstitutional conduct by police officers on the beat"); *Leite* v. *Providence*, 463 F. Supp. 585, 589 (D.R.I. 1978) ("[t]he vast majority of those courts which have considered the issue [degree of culpability required under § 1983] have not held high level officials liable for failure to supervise, correct and control the actions of their subordinates"); *Delaney* v. *Dias*, 415 F. Supp. 1351, 1353 (D. Mass. 1976), and cases cited. See generally Crocker, When Cops are Robbers -- Municipal Liability for Police Misconduct Under Section 1983 and Bivens, 15 U. Rich. L. Rev. 295 (1981). Just two years prior to the acts complained of in this case, the court in *Delaney, supra,* stated: "Public officials cannot be held liable for monetary damages under [§] 1983 purely for an alleged failure to exercise proper supervisory control over their subordinates. Many cases, in the specific context of alleged

abuse of police power, have held offending officers themselves liable, while dismissing complaints against supervisors who had no personal involvement in the alleged misconduct." Without a definitive ruling from the Supreme Court, the disagreement among the lower Federal courts regarding the scope of a supervisor's liability pursuant to § 1983 for the acts of his or her subordinates and the lack of decisions regarding a supervisor's liability after he or she takes disciplinary or supervisory action, can only be said to demonstrate that the law in this area was not "clearly established." Therefore, I conclude that the supervisory defendants were improperly denied qualified immunity.

2. *The Commonwealth's immunity under G. L. c. 258, § 10 (b)*. The court holds that a supervisor's disciplinary decisions, after an investigation into and determination of wrongdoing by a subordinate officer, is not a "discretionary function," within the meaning of G. L. c. 258, § 10 (*b*), and thus, the Commonwealth is liable for the supervisors' acts. Since I believe that a supervisor, in determining appropriate punishment on an individual, case-by-case basis, is exercising a "discretionary function," I conclude that the Commonwealth is immune from suit under G. L. c. 258, § 10 (*b*), in these circumstances.

The court seeks to distinguish the supervisory decision making in this case from that in *Cady* v. *Plymouth-Carver Regional School Dist.*, 17 Mass. App. Ct. 211 (1983), where the Appeals Court held that "[m]anagement of student imbroglios, *student discipline*, and school decorum fall readily within the discretionary function exception to the Tort Claims Act" (emphasis added). *Id.* at 217. Previously, we have cited *Cady* when discussing the discretionary function exception contained in G. L. c. 258, § 10 (*b*). See, e.g., *A.L.* v. *Commonwealth*, 402 Mass. 234, 245 (1988); *Pina* v. *Commonwealth*, 400 Mass. 408, 412-413 (1987); *Patrazza* v. *Commonwealth*, 398 Mass. 464, 468 (1986); *Kelley* v. *Rossi*, 395 Mass. 659, 665 n.6 (1985). The court seeks to avoid the obvious applicability of *Cady* by stating that the jury could have found that reinstating Driscoll was contrary to an unwritten existing policy. The result of the court's reading of *Cady*, as I see it, is that the

degree of discipline imposed by a supervisor is within the supervisor's discretion unless the jury decides that some unwritten policy would call for another form of discipline. I submit that is the same as saying that the jury can decide whether the degree of discipline imposed was appropriate. In such circumstances the discretionary function exception disappears. Because I believe that the process by which school administrators impose student discipline is strikingly similar to the process by which police supervisors discipline subordinate officers, I would hold that a police disciplinary process is also a "discretionary function" for purposes of the Massachusetts Tort Claims Act.

In determining that the school officials were acting pursuant to a "discretionary function," the Appeals Court stated: "Sizing up the gravity of a school yard feud, deciding how best to defuse it, and maintaining school discipline involve judgment, experience, and the intuition which is the sum of experience." *Cady, supra* at 216. See *Wightman* v. *Methuen*, 26 Mass. App. Ct. 279, 280 (1988). The court went on to say that "[s]tandards for dealing with bullying, or other manifestations of disruptive student behavior, must be as variable as the personalities of the students and the settings in which disruption occurs." *Cady, supra.* A decision to discipline a police officer for infractions also involves a supervisor's judgment, experience, and intuition and the punishment imposed for a particular infraction will also be as variable as the officer's personality and the circumstances in which the infraction occurs.[2] See *Pina*

_____

[2] Disciplinary procedures and supervisory responsibilities have been recognized to be "discretionary." See, e.g., *Carter* v. *Carlson*, 447 F.2d 358, 363 (D.C. Cir. 1971) ("[t]he functions of training, supervising and controlling police officers subsume a variety of distinct duties . . . . No doubt some of these duties should be regarded as discretionary for the purposes of official immunity, but others are clearly ministerial for that purpose"). See also *Davis* v. *Scherer*, 468 U.S. 183, 196 n.14 (1984) ("the decision to discharge an employee clearly is discretionary").

v. *Commonwealth,* 400 Mass. 408, 415 (1987) (discretionary decisions are "those in which a government official determines what action to take based on an individual, case-by-case analysis and in which his decision includes elements of judgment and discretion"), quoting *Bartel* v. *Federal Aviation Admin.,* 617 F. Supp. 190, 196 n.29 (D.D.C. 1985). The evidence which was presented to the jury regarding State police disciplinary procedures was that after completing an investigation the troop commander "make[s] a *judgment* based upon the information that was available to him" (emphasis added). A supervisor's "judgment" based upon the particular circumstances of an incident should not fall within the category of nondiscretionary acts for which the Commonwealth could be liable.

Furthermore, I conclude that imposing tort liability in this situation will jeopardize the quality and efficiency of a disciplinary process. The " 'quality and efficiency of the govermental process' requires, at a minimum, impartiality on the part of State employees." *Pina* v. *Commonwealth, supra* at 413, quoting *Whitney* v. *Worcester,* 373 Mass. 208, 219 (1977). Human nature indicates that, confronted with a "close call," the supervisor will impose harsher punishment for fear of judicial second guessing, and the imposition of liability, and thus "the impartiality of individual determinations [would] be threatened." *Id.*

It should be understood that what is significant is the nature of the disciplinary process itself and not the unfortunate misconduct of Driscoll which followed the imposition of discipline in this case, because "[u]nder the [Tort Claims Act], the exception applies even where there has been abuse of discretion." *Wightman, supra* at 281. See *Cady, supra* at 215 ("It is the nature of the governmental act, not the care with which it is performed, that determines whether the exception applies"). See also *Dalehite* v. *United States,* 346 U.S. 15, 35 (1953); *Patrazza* v. *Commonwealth,* 398 Mass. 464, 470 & n.3 (1986). Because police disciplinary proceedings are "characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices," *Whitney* v. *Worcester,*

373 Mass. 208, 218 (1977), I would hold that it falls within the discretionary function exception contained in G. L. c. 258, § 10 (*b*). Thus, the Commonwealth's motions for a directed verdict and judgment notwithstanding the verdict on this issue were improperly denied.

3. *The supervisory defendants' liability under 42 U.S.C. § 1983.* The court apparently concedes that the supervisors' liability would require a showing of more than mere negligence. In light of *Daniels* v. *Williams,* 474 U.S. 327, 328 (1986), and *Davidson* v. *Cannon,* 474 U.S. 344, 347-348 (1986), as interpreted in *Germany* v. *Vance,* 868 F.2d 9, 17-18 (1st Cir. 1989), I cannot agree that the culpability requirement has been met.

The supervisory defendants will be liable for the plaintiff's injuries, only if (1) the supervisory defendants acted under color of State law, and (2) their conduct deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States. See *Parratt* v. *Taylor,* 451 U.S. 527, 535 (1981); *Voutour* v. *Vitale,* 761 F.2d 812, 819 (1st Cir. 1985), cert. denied sub nom. *Saugus* v. *Voutour,* 474 U.S. 1100 (1986); *Appleton* v. *Hudson,* 397 Mass. 812, 818 (1986).

In this case, the constitutional deprivation relied on consisted of Trooper Driscoll's excessive use of force and verbal harassment while arresting and detaining Dobos. The gravamen of the plaintiffs' claim against the supervisory defendants is that their conduct caused Dobos to be subjected to the deprivation because they failed adequately to supervise and discipline Trooper Driscoll. See *Oklahoma City* v. *Tuttle,* 471 U.S. 808, 816-817 (1985). In *Daniels* v. *Williams, supra* at 328, the Supreme Court stated that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing an unintended loss of or injury to life, liberty, or property" (emphasis in original). See also *Davidson* v. *Cannon, supra* at 347-348 ("lack of care simply does not approach the sort of abusive governmental conduct that the Due Process Clause was designed to prevent"). While it is clear that an intentional deprivation would be actionable, *Daniels* v. *Williams, supra* at 331, the Court left open the question whether a lesser culpa-

bility standard would suffice. *Id.* at 334 n.3 ("this case affords us no occasion to consider whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause").

The Court of Appeals for the First Circuit has responded that "[c]ases in this circuit suggest that government officials may be liable for a deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights." *Germany* v. *Vance, supra* at 17-18. The court defined this culpability standard by stating that "[a]n official displays such a reckless or callous indifference when it would be manifest to any reasonable official that his conduct was *very likely* to violate an individual's constitutional rights" (emphasis added).[3] *Id.* at 18. In that court's view a reckless or callous indifference standard exemplifies "the arbitrary exercise of the powers of government," which the due process clause was designed to protect against, while "[n]egligence . . . no matter how 'gross' it may be [only] exemplifies lack of care." *Id.* at 18. Thus the question

[3] I do not reach the question whether the jury instructions were in accord with this standard, see *ante* at 655 n.12. The issue is, in my mind, open to serious question. The supervisory defendants requested instructions, citing *Daniels* v. *Williams, supra* and *Davidson* v. *Cannon, supra,* that negligence was an insufficient basis for § 1983 liability and that the plaintiffs must prove that the supervisory defendants acted in a "callous, intentional, or deliberately indifferent manner." The judge charged that, if the "failure to supervise or discipline him constituted gross negligence amounting to conscious indifference to the safety of the public," then the defendants would be liable. The remainder of the jury instructions are replete with references to the supervisors' "negligence," which easily could have misled the jury into believing that negligence was a sufficient basis for § 1983 liability. For example, in explaining the special question regarding causal negligence the judge instructed, "[T]he question is did [the supervisory defendants], by their act or omission, violate that duty by acting in violation of a standard of ordinary care." See *Daniels* v. *Williams, supra* at 332 ("[L]ack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law"). Also, the judge refused the supervisory defendants' request to elaborate on the difference in culpability between simple negligence and gross negligence as defined in the instructions, and refused to instruct the jury that they could not find the supervisory defendants liable on a respondeat superior theory.

becomes whether there was sufficient evidence to conclude that each supervisory defendant believed (or reasonably should have believed) that his conduct was *very likely* to result in Trooper Driscoll's violation of the plaintiff's constitutional rights. See *id.* at 18 n.10.

In reviewing the evidence, it is important to note that the plaintiffs failed to introduce any evidence that the four supervisory defendants maintained a custom, policy, or practice of failing to supervise or discipline Massachusetts State troopers from which the jury could infer that they encouraged, condoned, acquiesced in, or deliberately disregarded instances of civil rights violations by troopers under their command. See generally *Voutour* v. *Vitale, supra* at 820. Similarly, the plaintiffs failed to produce any evidence that excessive use of force or verbal harassment by Massachusetts State troopers was customary or prevalent, from which the jury could infer a policy authorizing or encouraging such action. See *id.* It was also undisputed that the supervisory defendants took disciplinary action on all substantiated complaints involving Trooper Driscoll. It is important to note, especially in regard to whether the defendants reasonably believed that putting Trooper Driscoll back on highway duty in 1977 was very likely to result in his committing constitutional violations, the fact that none of the prior complaints lodged against Trooper Driscoll involved false arrest, excessive force, or other "civil rights violations."[4] Without evidence of widespread abuses by other troopers, and the fact that a supervisor's liability cannot be predicated simply upon a respondeat superior theory, *Monell* v. *Department of Social Servs. of the City of N.Y.*, 436 U.S. 658, 663 n.7 (1978), the supervisory defendants' liability must rest solely on whether their returning Trooper Driscoll to road

---

[4] The plaintiffs do not appear to take issue with the discipline imposed on Driscoll as a result of the one incident which involved physical violence. In response to a substantiated complaint by Driscoll's girl friend that he had assaulted her and her children Driscoll was removed from highway duty. Driscoll was returned to road duty only after a psychiatrist certified that he was fit for contact with the public, and he was subject to strict probationary conditions.

duty in 1977 without imposing probationary conditions was very likely to violate Dobos's constitutional rights.

As the court points out the evidence regarding the defendant Robert Hunt was that, while Trooper Driscoll was under Hunt's command, Hunt disciplined Driscoll for what Hunt described as five "minor infractions." *Ante* at 640. Only two of these infractions involved complaints by motorists, and only one of the complaints was substantiated through an internal State police investigation. Hunt's culpability is said to rest on his failure to investigate Driscoll's disciplinary history before determining appropriate "discipline" even though he knew Driscoll's former captain once recommended that Driscoll be removed from the road. However, Hunt took some type of disciplinary action on each complaint. Furthermore, the evidence regarding Hunt's opinion that Driscoll was not fit to be on the highway on the date of the Dobos incident and his recommendation that Driscoll be enrolled in an "attitude awareness program," is irrelevant because both observations were made by taking into consideration the Dobos incident, and thus do not indicate anything about the propriety of Hunt's actions prior to September 4, 1978, much less that Hunt's conduct was very likely to violate Dobos's constitutional rights. Hunt's failure to investigate fully Driscoll's history does not, standing alone, provide a sufficient basis to impose § 1983 liability. Compare *Stokes* v. *Bullins*, 844 F.2d 269, 274-275 (5th Cir. 1988) (there was no gross negligence in town's failure fully to investigate police officer's arrest record before hiring him because "to hold the town . . . liable here would march municipal liability too far down the path toward liability based on negligence"). *Lopez* v. *Houston Independent School Dist.*, 817 F.2d 351, 354 (5th Cir. 1987) (there was no evidence to support allegation that supervisors were grossly negligent or deliberately indifferent to student's constitutional rights for failing to train properly bus drivers without evidence of a "widespread problem mandating an official response").

The evidence of culpability against the remaining supervisory defendants is even more inadequate. The defendant Canty, unaware that Driscoll had been previously removed from road

duty, testified that he knew of the two motorists' complaints in 1978, and agreed with Hunt that, in regard to one of the complaints, a verbal reprimand was sufficient punishment.[5] Canty's culpable conduct, like Hunt's, was his failure to investigate Driscoll's disciplinary history. However, Canty's failure in light of his lack of knowledge of Driscoll's prior conduct, would not indicate "to any reasonable official that [such] conduct was very likely to violate an individual's constitutional rights." *Germany* v. *Vance, supra* at 18. Compare *Stokes* v. *Bullins, supra.* Similarly, the defendant Trabucco's sole culpable act was that he recommended to the Commissioner of Public Safety that Driscoll be reinstated to road duty after serving a ten-month suspension because of inappropriate log entries and habitual tardiness. Again, Trabucco made this recommendation without determining, through his own investigation, whether Driscoll should have been put back on the road. Finally, the defendant Kehoe's only conceivable culpable conduct was that he reinstated Driscoll to road duty on Trabucco's recommendation.[6] The plaintiffs failed to produce any evidence that Kehoe was aware of any of the complaints which occurred from the time Driscoll was reinstated until the time of the Dobos incident.

While the plaintiffs concede that the supervisory defendants disciplined Trooper Driscoll, they argue that the discipline was inadequate and that when Driscoll was returned to road duty in 1977, it should have been with probationary conditions and other restrictions which would prevent future misconduct. However, inadequate discipline sounds in negligence which cannot support a due process violation. Compare *Williams* v. *Boston,* 784 F.2d 430, 434 (1st Cir. 1986) (complaint alleging

---

[5] The investigation into the second complaint was not complete at the time of the Dobos incident, and therefore neither Hunt nor any of the other supervisory defendants could have "imposed discipline" on that complaint.

[6] The court's reliance on Kehoe's removal of Driscoll from highway duty in 1976 and his subsequent reinstatement in 1977 without any probationary conditions is misplaced since that discipline was imposed because of Driscoll's inappropriate log entries and habitual tardiness and not because of any motorist's complaint. See note 4, *supra.*

that city provided inadequate security at high school football game sounded in simple negligence and thus could not support due process violation). Also, the plaintiffs failed to introduce any evidence on the adequacy of the supervision and discipline imposed and whether stricter discipline was warranted. See *Voutour* v. *Vitale*, 761 F.2d 812, 821-822 (1st Cir. 1985) (expert testimony that the defendant city's in-service firearms training was inadequate created an issue of fact precluding summary judgment).

Based on this record I cannot agree that a jury could properly find that each of the supervisory defendants acted recklessly or was callously indifferent to the plaintiff's constitutional rights even if they had been properly instructed. Even if I agreed with the court's conclusion that "[t]he probability of an incident such as that here in issue . . . could have been foreseen easily," *ante* at 658, that does not suffice because mere "probability" is not enough. The constitutional violation must have been "very likely" to occur. I do not think that it was.

For the reasons stated, I respectfully dissent.