884 F.2d 579
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ELECTRO-MATIC PRODUCTS, INC., a Michigan Corporation,
Plaintiff-Appellant,
v.
PRIME COMPUTERS, INC., a Delaware Corporation, Defendant-Appellee.
 No. 88-1790.
 United States Court of Appeals, Sixth Circuit.
 Aug. 28, 1989.
 
 Before KRUPANSKY and RYAN, Circuit Judges, and LIVELY, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff Electro-Matic Products, Inc. ("Electro-Matic"), appeals the district court's judgment for defendant Prime Computers, Inc. ("Prime"), in this diversity action. We affirm.
 
 I.
 
 2
 Plaintiff Electro-Matic is a manufacturer of industrial electrical control products, and it had revenues of more than $30 million in 1984. In early 1984, Electro-Matic contacted defendant Prime, a manufacturer of computer hardware, and expressed an interest in acquiring a new data processing system--hardware and software--in order to upgrade and expand its computer capabilities, including its inventory and accounting functions. Prime does not offer software for such manufacturing applications, but has licensing arrangements with software developers that market applications software compatible with Prime hardware. Prime sales representative Gary Kleiman referred Electro-Matic to Creata Data, Inc., a company that marketed manufacturing applications software developed by Escom, Inc.
 
 
 3
 Electro-Matic personnel then had various meetings and discussions with James O'Toole, president of Creata Data, to determine if the software offered by Creata Data would satisfy Electro-Matic's requirements. The nature and extent of the participation of Prime sales representative Kleiman in these discussions is a point of controversy. Electro-Matic personnel testified that Kleiman stated that Creata Data was the only available seller of Prime-compatible software; that the system, comprising Escom software and Prime hardware, could perform all functions desired by Electro-Matic; and that Prime would stand behind the system. Kleiman testified that he merely suggested to Electro-Matic that Creata Data was one of several sellers of Prime-compatible manufacturing applications software, and that he only assured Electro-Matic that Prime stood behind its hardware.
 
 
 4
 In April 1984, O'Toole submitted a detailed report to Electro-Matic describing the capabilities of the proposed system. In June 1984, Electro-Matic entered various agreements with Creata Data: a software license agreement; an equipment sales agreement, under which Creata Data agreed to sell a Prime 2550-II hardware system to Electro-Matic; and a conversion agreement, which governed Creata Data's design, programming, and installation of the applications software. Creata Data then ordered the Prime hardware from Escom, a licensed distributor of Prime products. Prime was not a party to any of these agreements.
 
 
 5
 Prime delivered and installed the hardware at Electro-Matic in October 1984. In February 1985, Electro-Matic entered a hardware service agreement with Prime under which Prime agreed to perform maintenance work to keep the hardware in good operating condition in exchange for a fixed monthly charge.
 
 
 6
 After Prime installed the hardware, Creata Data began the installation of the applications software. Electro-Matic alleges that Creata Data represented that this project would be completed by March 1985; however, by early 1986 the project was not completed. Electro-Matic then discharged Creata Data and hired another party to complete the installation. Electro-Matic claims that the delay in installation caused lost profits, and that the new system is incapable of performing all of the functions that Creata Data and Kleiman represented that it would.
 
 
 7
 In August 1986 Electro-Matic brought this action against Prime, Creata Data, and Escom in Michigan state court.[1] Electro-Matic's complaint raised the following claims against Prime: Count I (Negligence)--that Prime was negligent in referring Electro-Matic to Creata Data; Count II (Breach of Contract)--that Prime was liable for the failure of its agent, Creata Data, to install the applications software in a timely and competent manner; Count III (Fraud and Misrepresentation)--that Prime and its agent, Creata Data, made false and fraudulent representations of Creata Data's ability to provide a computer system satisfactory to Electro-Matic's requirements.[2] Defendants removed to federal court on diversity grounds, and Prime moved for summary judgment on all claims. The district court held that the negligence count was barred under the Michigan "economic loss doctrine," but denied summary judgment with respect to the contract and the fraud and misrepresentation counts.[3]
 
 
 8
 The case proceeded to jury trial. At the close of plaintiff's proofs, Prime moved for directed verdict on the contract and the fraud and misrepresentation claims. The court granted directed verdict for Prime on these claims except as to Electro-Matic's claim that Prime breached the hardware service agreement, a claim raised at trial but not expressly stated in Electro-Matic's complaint.
 
 
 9
 The case continued on the breach of service agreement claim, and the jury returned a verdict for Electro-Matic, awarding damages of $78,000. The district court then granted Prime's motion for judgment n.o.v., holding that even if sufficient evidence supported the jury's verdict that Prime breached the service agreement, Electro-Matic was barred from recovering consequential damages by the unambiguous language of the agreement. Electro-Matic timely filed this appeal.
 
 II.
 
 10
 Electro-Matic argues that the district court erred by holding that Electro-Matic's negligence claim is barred under the Michigan economic loss doctrine. Under this doctrine, Michigan courts hold that
 
 
 11
 "[w]here the suit is between a non-performance seller and an aggrieved buyer and the injury consists of damage to the goods themselves and the costs of repair of such damage or a loss of profits that the deal had been expected to yield to the buyer, it would be sensible to limit the buyer's rights to those provided by the Uniform Commercial Code."
 
 
 12
 McGhee v. GMC Truck & Coach Div., 98 Mich.App. 495, 505, 296 N.W.2d 286 (1980) (citations omitted).
 
 
 13
 Electro-Matic's negligence claim against Prime does not arise from a transaction in goods; rather, the complaint alleges negligent performance of a service--that Prime breached "a duty ... to investigate the competency of the companies that it referred." The U.C.C., which applies to "transactions in goods," M.C.L. Sec. 440.2102; Wells v. 10-X Mfg. Co., 609 F.2d 248, 254 (6th Cir.1979), would therefore provide no remedy for this alleged injury, and the rationale underlying the economic loss doctrine--that remedies for economic harms arising from the sale of defective goods are provided under the U.C.C.--is not applicable. Therefore, the Michigan economic loss doctrine is not a bar to Electro-Matic's negligence claim.
 
 
 14
 Nonetheless, we agree that summary judgment for Prime on this claim is appropriate. Accepting as true Electro-Matic's allegations that Prime represented that Creata Data was the only available installer of Prime-compatible software, that Creata Data was incompetent, and that Prime failed to investigate Creata Data's competency, Electro-Matic cannot establish the existence of a legal duty owed by Prime to it. Under Michigan law, the existence of a legal duty is a question of law for the court. Smith v. Allendale Mutual Ins. Co., 410 Mich. 685, 713, 303 N.W.2d 702 (1981). Electro-Matic cites no Michigan authority, nor is this court aware of any, which establishes a duty owed by one business entity to another to investigate the competency of a third entity to which a referral is made. The case Electro-Matic does cite, Bacco Construction Co. v. American Colloid Co., 148 Mich.App. 397, 384 N.W.2d 427 (1986), establishes no such duty; it merely holds that a "design professional," such as a project engineer or architect, owes a duty to foreseeable victims of negligent performance, such as a general contractor, even in the absence of contractual privity.
 
 
 15
 We affirm the district court's grant of summary judgment for Prime on Electro-Matic's negligence claim on the ground that Electro-Matic failed to state a cognizable claim because Prime owed no legal duty to Electro-Matic.
 
 III.
 
 16
 Electro-Matic also challenges the district court's grant of directed verdict for Prime on Electro-Matic's claims of breach of contract (except for breach of the hardware service contract), and fraud and misrepresentation. In this circuit, state law governs the question of whether directed verdict is appropriate. Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co., 709 F.2d 427, 430 n. 3 (6th Cir.1983). Under Michigan law,
 
 
 17
 [i]n deciding whether the trial court erred in entering a directed verdict, we review all the evidence presented to determine whether a question of fact existed. In so doing, we view the evidence in a light most favorable to the nonmoving party, granting him every reasonable inference and resolving any conflict in the evidence in his favor. If the evidence viewed in this manner establishes a prima facie case, we must reverse the trial court's grant of a directed verdict. Caldwell v. Fox, 394 Mich. 401, 231 N.W.2d 46 (1975).
 
 
 18
 Cody v. Marcel Electric Co., 71 Mich.App. 714, 717, 248 N.W.2d 663 (1976).
 
 A.
 
 19
 The district court held that Prime was entitled to directed verdict on the contract claims arising from the Electro-Matic-Creata Data contracts on the ground that Electro-Matic did not establish that Creata Data was an agent of Prime. Electro-Matic contends that there is evidence sufficient to make the agency issue a question for the jury.
 
 
 20
 It is well established under Michigan law that "[t]he test of principal and agent is the right to control." Birou v. Thompson-Brown Co., 67 Mich.App. 502, 507, 241 N.W.2d 265 (1976). Electro-Matic points to various facts that, it contends, demonstrate Prime's control over Creata Data. Viewing the evidence in a light favorable to Electro-Matic, we conclude that the evidence Electro-Matic identifies shows, at most, that Prime and Creata Data worked closely together to sell compatible products; it does not support an inference that Prime controlled or directed Creata Data. The unrebutted testimony of James O'Toole, President of Creata Data, was that Creata Data was not under the direction or control of Prime:
 
 
 21
 Q. Did you work under the direction of Prime Computer?
 
 
 22
 A. Did not.
 
 
 23
 Q. Did Prime tell you who to go see?
 
 
 24
 A. They recommended that I go see certain people and I did.
 
 
 25
 Q. Did they give you a time frame--
 
 
 26
 A. I didn't have to go see anybody. I wasn't working at their direction. They weren't paying me any money. I could choose to see the person they recommended or not to, I was my own independent company.
 
 
 27
 J.App. at 254-55.
 
 
 28
 Because Electro-Matic was unable to establish that Prime controlled Creata Data and therefore that Creata Data was an agent of Prime, we affirm the district court's grant of directed verdict for Prime on Electro-Matic's contract claims against Prime that are based on contracts between Electro-Matic and Creata Data.
 
 B.
 
 29
 Electro-Matic also challenges the district court's grant of directed verdict for Prime on the fraud and misrepresentation claims. The district court granted directed verdict for Prime because Electro-Matic could not show that it relied on the alleged misrepresentations, a required element of fraud and misrepresentation actions under Michigan law. E.g., United States Fidelity & Guaranty Co. v. Black, 412 Mich. 99, 313 N.W.2d 77 (1981).[4]
 
 
 30
 The alleged misrepresentations by Prime are Kleiman's alleged statements that the software could perform the functions that Electro-Matic required, that Creata Data was reliable, that Prime had worked successfully with Creata Data in the past, and that Prime would stand behind the computer system. Assuming that Kleiman made these statements, and that they were not mere "puffing," Electro-Matic points to no evidence that it acted in reliance upon the statements. The record shows instead that Electro-Matic personnel, including their computer specialist and their legal counsel, conducted an independent evaluation of Creata Data and the capabilities of the proposed system. Electro-Matic then chose to enter agreements solely with Creata Data. "There is no fraud where means of knowledge are open to the plaintiff and the degree of their utilization is circumscribed in no respect by defendant." Schuler v. American Motors Sales Corp., 39 Mich.App. 276, 280, 197 N.W.2d 493 (1972). Electro-Matic is a sophisticated business entity that was either aware or had an opportunity to become aware of the potential risks of contracting with Creata Data. It is not reasonable to infer that it contracted with Creata Data in reliance upon the statements of a Prime sales representative. We therefore affirm the district court's grant of directed verdict for Prime on the fraud and misrepresentation claims because Electro-Matic cannot show that it acted in reliance upon the alleged statements by Prime.
 
 IV.
 
 31
 Electro-Matic's final argument on appeal is that the district court erred in granting Prime's motion for judgment n.o.v. on Electro-Matic's claim of breach of the hardware service agreement.[5] Electro-Matic sought recovery for lost profits resulting from Prime's alleged delay in performing service work on the hardware, and the jury granted judgment for Electro-Matic on this claim and awarded damages of $78,000. The district court held that, assuming sufficient evidence supported the jury verdict that Prime had breached the service agreement, Electro-Matic could not, under the express language of the agreement, recover consequential damages, and the court therefore granted Prime's motion for judgment n.o.v.[6]
 
 
 32
 Section 8.2 of the service agreement provides:
 
 
 33
 PRIME will not be liable for any failure or delay in performance due in whole or in part to any cause beyond PRIME's reasonable control. In no event will PRIME be liable for loss of data or use of the Equipment and for any incidental, indirect, special or consequential damages arising out of the Schedule or the performance of any services provided in this Schedule or for any cause of action that arose more than one (1) year prior to the institution of suit thereon.
 
 
 34
 Electro-Matic first argues that the terms of Sec. 8.2 do not unambiguously exclude recovery of consequential damages. We find the express exclusion of liability for "incidental, indirect, special or consequential damages" in section 8.2 to be perfectly clear; Electro-Matic's arguments to the contrary are groundless.
 
 
 35
 Electro-Matic also contends that the limited remedy of Sec. 8.2 fails of its essential purpose and that therefore the exclusion of consequential damages should be disregarded as unconscionable. This argument is also without merit. In determining whether a damages limitation or exclusion clause is unconscionable, this court has noted that "[u]nconscionability deals with grossly unequal bargaining power at the time of ... contract[] formation. As numerous decisions have pointed out, unconscionability rarely exists unless the buyer is a consumer." Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co., 709 F.2d 427, 435 (6th Cir.1983). Massachusetts is in accord. The Massachusetts Supreme Judicial Court has held that excluding consequential damages "where the two parties are sophisticated business entities, and where consequential damages in the event of a problem could be extensive, is a reasonable business practice." Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 495 N.E.2d 303 (1986).
 
 
 36
 Electro-Matic points to no facts supporting an inference that its bargaining power was unequal to that of Prime when they entered the hardware service agreement. Moreover, consequential damages resulting from breach of the hardware service agreement could likely be extensive; the court's disregard of the exclusion provision would therefore effect a significant shift in the contractual risk allocation freely reached by the parties. We therefore reject Electro-Matic's contention that the express exclusion of consequential damages of Sec. 8.2 should be disregarded, and we affirm the district court's grant of judgment n.o.v. for Prime on Electro-Matic's claim for breach of the service agreement.
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 Escom and Creata Data are not parties to this appeal. Escom settled with Electro-Matic during trial, and a default judgment was entered against Creata Data, which has apparently gone bankrupt
 
 
 [2]
 Electro-Matic's complaint stated a fourth count, alleging violation of the Michigan Consumer Protection Act. To the extent this count stated a claim against Prime, it was dismissed with prejudice by stipulation of the parties
 
 
 [3]
 The court's summary judgment opinion purported to grant summary judgment for Prime on the fraud and misrepresentation count. Yet the parties and the district court continued to consider these claims viable until the district court granted a directed verdict for Prime. We therefore consider Prime's motion for summary judgment on the fraud and misrepresentation count denied
 
 
 [4]
 To the extent that Electro-Matic's fraud and misrepresentation claims were based on statements of Creata Data as an agent of Prime, the district court granted directed verdict for Prime on the ground that Electro-Matic failed to establish a principal-agent relationship between Prime and Creata Data. We affirm this holding for the reasons stated in part III.A above
 
 
 [5]
 Electro-Matic did not expressly raise a claim of breach of the hardware service agreement in its complaint or in the final pretrial report. However, the district court properly held that Prime waived the failure to plead as a ground for judgment n.o.v. by its failure to raise the issue in its motion for directed verdict. See 9 C. Wright & A. Miller, Federal Practice & Procedure Sec. 2537, at 598 (1971)
 
 
 [6]
 The hardware service agreement provides that it is to be governed by Massachusetts law, under which judgment n.o.v. is not appropriate where " 'anywhere in the evidence, from whatever source, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " Dobos v. Driscoll, 404 Mass. 634, 537 N.E.2d 558 (1989) (citations omitted)