TURNPIKE MOTORS, INC., & others[1] *vs.* NEWBURY GROUP,
INC., & another.[2]

Suffolk. April 8, 1992. - July 16, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Broker*, Commission. *Sale*, Of corporate property. *Corporation*, Sale of assets. *Estoppel*. *Practice, Civil*, Judgment notwithstanding verdict, New trial, Judicial discretion. *Consumer Protection Act*, Unfair act or practice.

In an action in which a broker sought to recover commissions due on the sales of assets of two automobile dealerships, which included real estate and tangible and intangible personal property, the judge incorrectly allowed the sellers' motion for judgment notwithstanding the verdict where the broker had introduced evidence that it had reasonably relied to its detriment on the sellers' representations that the sale was a sale of corporate stock and therefore the sellers were estopped to raise G. L. c. 112, § 87RR, as a bar to the broker's claim for commissions. [121-126] O'CONNOR, J., dissenting.

In a civil action, the judge did not adequately specify the grounds for his conditional grant of a motion for new trial [127-129]; nor did it appear that the judge applied the correct standard in ruling on the motion [129]; moreover, there was no support in the record for a claim that the jury's verdict was the result of bias, misapprehension, or prejudice or a failure carefully to consider the evidence [129-130]. O'CONNOR, J., dissenting.

In a civil action in which a broker claimed that sellers of certain property violated G. L. c. 93A, § 11, by refusing to pay the broker a commission, the judge's findings supported his conclusion that the sellers justifiably withheld payment of the fee to the broker on advice of counsel. [130-131]

---

[1]Gene's Foreign Car Service, Inc., Eugene F. Looney, John A. Ryan, and James B. Ryan. A suggestion of death was filed on May 5, 1989, on behalf of James B. Ryan. The individuals are the sole stockholders in the corporations. We refer to the plaintiffs collectively as the "sellers."

[2]David Hackett. We refer to the defendants collectively as the "broker."

CIVIL ACTION commenced in the Superior Court Department on May 30, 1984.

After review reported in 403 Mass. 291 (1988), the case was tried before *John Paul Sullivan*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Marcus E. Cohn* (*Rachel Beth Cohen* with him) for the defendants.

*Gary R. Greenberg* (*George W. Mykulak & Louis J. Scerra, Jr.*, with him) for the plaintiffs.

NOLAN, J. The sellers commenced this action in May, 1984, seeking a declaratory judgment that the defendant broker was not entitled to any commissions on the sales of the assets of two automobile dealerships, which included interests in real estate and both tangible and intangible personal property, because the broker was not a licensed real estate broker as required by G. L. c. 112, § 87RR (1990 ed.).[3] The broker, seeking to recover commissions and damages under G. L. c. 93A, counterclaimed and contended that the sellers were estopped to use G. L. c. 112, § 87RR, to deny commissions to the broker. On appeal of summary judgment in favor of the sellers and against the broker on its counterclaim, this court vacated that decision and remanded the case to the Superior Court. *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 403 Mass. 291, 297 (1988) (*Turnpike Motors I*). In *Turnpike Motors I*, a majority of this court held that: (1) while an unlicensed broker is not entitled to collect a commission on the sale of real estate under G. L. c. 112, § 87RR, that statute does not bar the collection of a commission on the sale of personal property as part of the same transaction; and (2) G. L. c. 112, § 87RR, will not bar full recovery of a commission to an unlicensed broker if that

---

[3]Section 87RR provides that one who acts as a real estate broker "directly or indirectly, either temporarily or as an incident to any other transaction, or otherwise" must be licensed by the Commonwealth, and that no one shall recover in any action "for compensation for services as a broker performed within the commonwealth unless he was a duly licensed broker at the time such services were performed."

broker reasonably relied to its detriment on the sellers' representations that the sale was a sale of corporate stock.

On remand, the jury, in answer to special questions, found that the sellers were estopped to raise G. L. c. 112, § 87RR, as a bar to the broker's claim for commissions, and awarded damages to the broker in the amount of $343,000. The sellers then filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. The trial judge granted the motion in part, entering judgment for the broker in the amount of $69,479.15, which reflected commissions on only the tangible personal property interests. The judge then ruled that, in the event that an appellate court reversed his decision, the sellers would be entitled to a new trial. The judge also dismissed the broker's counterclaim under G. L. c. 93A. We granted the broker's application for direct appellate review.

On appeal, the broker contends that it was error for the judge to: (1) allow the sellers' motion for judgment notwithstanding the verdict; (2) grant a new trial conditionally; and (3) deny the broker any recovery under c. 93A.[4] We agree with the broker that the judge erred in granting the sellers' motion for judgment notwithstanding the verdict or, alternatively, a new trial, but we affirm the judge's dismissal of the broker's c. 93A counterclaim. We therefore direct the Superior Court judge to enter judgment in accordance with the jury's verdict.

1. *The judgment notwithstanding the verdict.* In reviewing a judge's allowance of a motion for judgment notwithstanding the verdict, we determine whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the [broker]." *Dobos* v. *Driscoll*, 404 Mass. 634, 656, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989), quoting *Poirier* v. *Plymouth*,

---

[4]Given our rulings on these issues, we need not consider the broker's argument on appeal concerning the judge's calculation of damages for commissions on the sale of the personal property interests.

374 Mass. 206, 212 (1978). The judge concluded that judgment notwithstanding the verdict was warranted because the broker failed to present evidence sufficient to warrant an estoppel. Specifically, the judge ruled that the evidence did not warrant a finding of reasonable reliance by the broker, and that the broker did not present adequate evidence of two of the four factual elements that we considered in *Turnpike Motors I, supra* at 295-296.[5]

In *Turnpike Motors I, supra* at 296, we discussed four facts alleged in the broker's pleadings, and we stated that, if these facts were true, the sellers would be estopped to deny the broker full commissions. Both the judge and the sellers, as well as the dissent in this appeal, have taken that discussion to mean that *Turnpike Motors I* holds that the sellers can only be estopped to deny the broker full commissions if the broker is able to prove that these four specific facts are true.[6] Our conclusion in *Turnpike Motors I*, however, that certain of the facts alleged by the broker, if true, would lead

---

[5]"The broker's claim is based on its assertion that, when it told a representative of the sellers that it was not a real estate broker, the sellers' representative answered that the absence of a license would not be a problem. The broker claims that the sellers agreed that the sales of the two businesses could be in the form of sales of corporate stock. It further claims that it easily could have obtained, as it now has, a real estate broker's license if it had known one would be needed and that the sellers restructured the sales as sales of assets rather than of stock for the purpose of defeating the broker's commissions." *Turnpike Motors I*, 403 Mass. 291, 295-296 (1988).

[6]The judge did find that there was adequate evidence at trial concerning the first two of those four factual elements. Additionally, there was evidence from which the jury could have concluded that the other two factual elements were proved. There was evidence that Hackett's friend and attorney, John Zizza, did easily become an officer of the broker and a licensed real estate broker. Contrary to the judge's finding that there was "not a scintilla of evidence" that the sellers ever represented that they intended to transfer the real estate to their corporations prior to the sales of the automobile dealerships, the agreements between the broker and the sellers specifically state that the assets of the corporations "*will include* all the real estate" (emphasis added). The jury could have reasonably concluded from these agreements, therefore, that the sellers intended to transfer the real estate to the corporations in order that, at the time of the actual sale of the corporations, the sales could be of corporate stock and not real estate.

to an estoppel, does not prevent the broker from making its case based on other facts alleged within the pleadings, nor does it necessarily require that proof of each of these specific facts is a threshold step that the broker must climb in order to prove its case.

"It was said in *Greenwood* v. *Martins Bank, Ltd.* [1933] A.C. 51, 57: 'The essential factors giving rise to an estoppel are . . . (1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omission.' " *Cleaveland* v. *Malden Sav. Bank*, 291 Mass. 295, 297-298 (1935). These essential factors are present in this case. As the judge found, there was adequate evidence presented by the broker at trial to establish that the defendant David Hackett informed the sellers' representative, the plaintiff Eugene F. Looney, that Hackett was not a licensed real estate broker, and that Looney told Hackett that a license would not be necessary because the transaction would be structured as a sale of stock of a corporation rather than real estate. The agreements signed between the broker and the sellers reflected Looney's representation that the potential sales would involve corporations whose assets would include real estate.[7] The jury reasonably could have inferred from Looney's testimony that he did not intend to pay the agreed-upon commissions

---

[7]The agreement between the broker and the sellers for one of the businesses, Boston Mazda, included the following language: "Newbury Group, Inc. shall be owed one hundred and eighty thousand dollars ($180,000) even if the sales price *of said corporation* is sold for less than one million eight hundred thousand dollars. . . . It is understood that the assets *of the corporation* will include all the real estate at 201 Cambridge street, the entire parts inventory, equipment, and office furnishings" (emphasis added). The agreement concerning the other business, Gene's Foreign Car Service, Inc., contained similar language except for the amount of the commission and the location of the business.

when he signed the agreements with the broker.[8] Following
the signing of those agreements, the broker sought out and
procured buyers for the sellers' businesses, but the sellers
have refused to compensate the broker for these services in
accordance with their agreements with the broker. All of
these factors would support the jury's conclusion that
Looney's representations to the broker induced the broker to
procure buyers for the sellers, and that the broker suffered
detriment from its uncompensated, but successful, efforts on
behalf of the sellers.[9]

---

[8]Looney testified on direct and cross-examination that, although he
signed the agreements with the broker, he never read these documents.
Looney also testified as follows on cross-examination:

COUNSEL FOR THE BROKER: "One of the reasons that you didn't pay the
commission due to my client is because you thought it was too high,
right?"

THE WITNESS: "One of the reasons, yes."

COUNSEL FOR THE BROKER: "And how high was it? How much was it
did you think that it was too high by?"

THE WITNESS: "About 6 percent."

COUNSEL FOR THE BROKER: "About 6 percent. Did you tell Mr. Hackett
that?"

THE WITNESS: "No, sir."

COUNSEL FOR THE BROKER: "Did you tell him that on September 21st,
1983?"

THE WITNESS: "No, sir."

COUNSEL FOR THE BROKER: "But it was 6 percent too high on Septem-
ber 22nd, 1983 [when the parties signed the agreement], wasn't it?"

THE WITNESS: "Maybe the 23[rd] or 4th."

COUNSEL FOR THE BROKER: "You told him on the 23rd or 4th?"

THE WITNESS: "I didn't tell him anything. I thought it was too high."

COUNSEL FOR THE BROKER: "Right after you signed this agreement you
decided not to pay him 10 percent, didn't you, sir?"

". . .

THE WITNESS: "Yes, sir."

[9]The dissent characterizes the issue in this case as whether there was
evidence that, when the broker performed the services for which it seeks
commissions, it could and would have been licensed as a real estate broker
if it had not been misled into thinking that the sales were to be sales only
of corporate stock. The dissent appears to argue that only an omission on
the part of the broker, its failure to seek a real estate license, can give rise
to estoppel. Estoppel, however, can arise from either an omission or an act
by the person to whom the representation is made. See *Cleaveland* v. *Mal-
den Sav. Bank*, 291 Mass. 295, 298 (1935) (essential factor in an estoppel
is "an act or omission" resulting from the representation); Restatement

It is also necessary, however, that the reliance of the party seeking the benefit of estoppel must have been reasonable. See *O'Blenes* v. *Zoning Bd. of Appeals of Lynn*, 397 Mass. 555, 558 (1986), and cases cited. The jury could reasonably have inferred from the evidence that the broker's reliance was reasonable. Looney's representations induced Hackett to undertake efforts on behalf of the sellers. The formal agreements between the broker and the sellers supported those representations. Hackett, who had been in business only a short time and had little education beyond high school, dealt directly with both Looney, a sophisticated businessman, and Looney's attorney from whom, it was reasonable for Hackett to assume, the sellers sought advice.[10] All the sellers, as well

---

(Second) of Contracts § 90 (1981) (promise which promisor should reasonably expect to induce "action or forbearance" can be binding); 1A A. Corbin, Contracts § 200, at 215 (1963) ("action or forbearance" in reliance on a promise can be sufficient reason for enforcing the promise). In this case, it is clear to a majority of this court that there were sufficient acts by the broker to justify an estoppel, and it is not necessary to consider the issue whether the broker could have or would have procured a license but for the sellers' representations.

We note, however, that G. L. c. 112, § 87RR, explicitly required the broker to be licensed only "at the time . . . services were performed," and not at the time the agreements were reached. See generally Annot., Procurement of Real-Estate Broker's License Subsequent to Execution of Contract for Services as Entitling Broker to Compensation for Services, 80 A.L.R.3d 318 (1977). Hackett testified that he would not have taken steps to perform services for the sellers unless they signed the agreements, which reflected Looney's representation that the sales would involve corporations and not real estate. Hackett's friend and attorney, John Zizza, did easily become an officer of the broker and a licensed real estate broker, and he could just as easily obtain a license for the broker pursuant to G. L. c. 112, § 87UU (1990 ed.). Even though Hackett himself could not have easily become licensed, the broker could take any number of steps to adhere to the statute, such as hiring a licensed salesman. All of these steps could have been taken after the agreement was signed but before the broker performed any services for the sellers. While, as the dissent points out, there is no evidence that the broker would have undertaken such steps, such evidence is unnecessary because Looney's representations made such speculation a moot point.

[10]Looney testified that he generally consulted with his attorney every time he had a legal issue. Another plaintiff, John Ryan, who also signed the agreements with the broker, testified that he relied on the advice of counsel for any contract he signed.

as their attorney, consulted with the broker in the preparation of the agreements. The asking prices for the automobile dealerships included the amounts necessary to pay the broker's commissions. Several agreements between the sellers and buyers of the businesses, which, according to Looney's testimony, were signed after he became aware of the broker's lack of a license, explicitly referred to the sellers' obligation to pay commissions to the broker.[11] In these circumstances, the broker's reliance was reasonable and the jury were warranted in concluding that the sellers should be estopped to raise the issue of the broker's lack of a real estate license, and we reverse the judge's grant of the sellers' motion for judgment notwithstanding the verdict.[12]

---

[11]A letter of intent concerning the Boston Mazda business, dated December 22, 1983, included the following language: "Sellers acknowledge that they have engaged David Hackett to act as broker in connection with finding a buyer for the assets that are the subject matter of this letter of intent. It is understood and agreed that the Sellers are solely responsible for all fees and commissions due and owing to said broker by reason of the transactions contemplated by this letter of intent." A subsequent agreement concerning the Boston Mazda business, dated April 25, 1984, included the following clause: "Except for the engagement of David Hackett, whose fees and commissions, as agreed by and between the Seller and David Hackett, the Seller hereby agrees to pay . . . ." A purchase and sale agreement concerning Gene's Foreign Car Service, Inc., dated March 2, 1984, included the following clause: "Seller agrees, simultaneously with the Closing, to pay the full amount of the commission due [the broker] for its services in connection with this transaction."

[12]The dissent somehow finds it strange, in spite of our decision in *Turnpike Motors I*, that a majority of this court would, under equitable principles, affirm the jury's award of damages to the broker who engaged in these activities without meeting the requirements of G. L. c. 112, § 87RR. We recognize, however, that "[i]t is in the main to accomplish the prevention of results contrary to good conscience and fair dealing that the doctrine of estoppel has been formulated and taken its place as a part of the law." *McLearn* v. *Hill*, 276 Mass. 519, 524 (1931). While it is true that the broker in this case will receive commissions to which it is not entitled under statute, a different result would enable the sellers to reap a windfall because, according to Looney's own testimony, the sale prices of the businesses took into account the commissions owed to the broker. In our opinion, to allow the sellers to reap such a windfall, after knowingly inducing the broker to undertake successful efforts on their behalf, is contrary to good conscience and fair dealing. As this court said in *Town Planning & Eng'g Assocs.* v. *Amesbury Specialty Co.*, 369 Mass. 737, 747 (1976),

2. *The motion for a new trial.* The grant or denial of a motion for "a new trial on the ground that the verdict is against the weight of the evidence rests in the discretion of the judge." *Robertson* v. *Gaston Snow & Ely Bartlett*, 404 Mass. 515, 520, cert. denied, 493 U.S. 894 (1989), quoting *Bergdoll* v. *Suprynowicz*, 359 Mass. 173, 175 (1971). The judge, however, "should not decide the case as if sitting without a jury; rather, the judge should only set aside the verdict if satisfied that the jury 'failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law.' " *Robertson, supra*, quoting *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 60 (1948). Moreover, a judge should exercise this discretion only when the verdict "is so greatly against the weight of the evidence as to induce in his mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice." *Scannell* v. *Boston Elevated Ry.*, 208 Mass. 513, 514 (1911). The grant or denial of a new trial, however, will only be disturbed if the judge has abused his discretion. *Robertson* v. *Gaston Snow & Ely Bartlett, supra* at 520-521.

In the same memorandum granting the sellers' motion for judgment notwithstanding the verdict, the judge ruled as follows: "Assuming that a Reviewing Court rules that this Justice has decided the Rule 50(b) motion improperly, this Justice pursuant to the provisions of Rule 50(c) rules that on the issue of estoppel the verdict is against the weight of the evidence and conditionally allows the motion for new trial pursuant to the provisions of Rules 59 and 50(c)." Rule 50(c)

---

quoting 6A A. Corbin, Contracts § 1512, at 713 (1962), "justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but to repudiating defendants." See *Joffe* v. *Wilson*, 381 Mass. 47, 55-56 (1980) (certified public accountant with agreement in violation of intermediation rule entitled to recover agreed-upon fees); *Harness Tracks Sec., Inc.* v. *Bay State Raceway, Inc.*, 374 Mass. 362, 366-367 (1978) (unlicensed detective business entitled to recovery for services in accordance with terms of written contract); Restatement (Second) of Contracts § 181 (1981) (promise not necessarily unenforceable if one party fails to comply with licensing statute).

does permit the conditional ruling on a motion for a new trial, as the judge made here, but the same rule requires the judge to "specify the grounds for granting or denying the motion for the new trial." Mass. R. Civ. P. 50 (c), 365 Mass. 814 (1974). The judge in this case, however, failed to specify any grounds for his conditional ruling beyond his brief statement that the verdict was against the weight of the evidence.

We have held that the requirement that a litigant state specific grounds in support of a motion for a directed verdict is important in order to allow the judge knowingly to rule on the question before him, and to allow the opposing party an opportunity to rectify any deficiencies in its case. See *Bonofiglio* v. *Commercial Union Ins. Co.*, 411 Mass. 31, 34-35 (1991), *S.C.*, 412 Mass. 612 (1992). Similarly, the requirement that a judge specify the grounds for a conditional ruling on a motion for a new trial is important in order to allow a reviewing court knowingly to rule on the question before it, and to allow the opposing party an opportunity to rectify any deficiencies in its case before retrial. See *Robertson* v. *Gaston Snow & Ely Bartlett, supra* at 521 n.3 (judge's express finding indicates he understood and applied correct legal standard); *Powell* v. *Lititz Mut. Ins. Co.*, 419 F.2d 62, 65 (5th Cir. 1969) ("Our review is greatly hampered by the fact that the court below . . . did not specify the grounds for [conditionally] granting the motion for a new trial"). While the judge wrote extensively on the sufficiency of the evidence to warrant the jury's verdict, we have already concluded that the judge applied an incorrect legal standard. The problem is · that, outside of the judge's inappropriate conclusions concerning the sufficiency of the evidence, we have no knowledge of what else may have caused the judge to conclude that the jury failed to exercise "honest and reasonable judgment in accordance with the controlling principles of law."[13] *Robert-*

---

[13]The dissent, apparently recognizing that no one can know exactly what caused the judge to conclude as he did, can only speculate on what the judge's reasoning was. *Post* at 145-147. The dissenting Justice apparently believes that the deficiency on the part of the judge mandates an affirmance of his ruling. Such an approach, however, would deny parties a

*son* v. *Gaston Snow & Ely Bartlett, supra* at 520. To the extent that the judge's ruling on the motion for a new trial rests on the same inappropriate legal standards, his ruling is insupportable.[14]

Moreover, the judge himself later raised serious questions about his motivation for the conditional grant of the motion for a new trial. In a hearing on the sellers' motion to dissolve postverdict security and to dismiss reach and apply claims, the judge stated as follows: "Part of my decision, I don't know how to put it diplomatically, is a suggestion to [the Justices of this court] that they re-examine more closely what they did and, perhaps, they take umbrage at that. So, I mean, in terms of the probability of success . . . frankly, if I were a betting man standing apart from it, I would think that the opposing party is going to prevail." This statement certainly does not reflect a strong belief that the jury's verdict was not due to a careful consideration of the evidence. Instead of a strong belief that the jury's verdict was the result of bias, misapprehension, or prejudice, this statement reflects the judge's underlying difference of opinion with this court's reasoning in *Turnpike Motors I.*

Given the judge's inadequate specification of grounds for the conditional grant of a new trial, along with his stated intention that this court reexamine *Turnpike Motors I,* even while believing that the broker would prevail on appeal, it appears that the judge has not followed the applicable standards in his conditional grant of the sellers' motion for a new trial. Moreover, we find nothing in the record or in the sellers' arguments on appeal to convince us that the jury failed to exercise an honest and reasonable judgment in accordance

---

proper appellate review of new trial decisions. See *Champeau* v. *Fruehauf Corp.,* 814 F.2d 1271, 1274 (8th Cir. 1987).

[14]The sellers' supplement to their motion for judgment notwithstanding the verdict, or, alternatively, a new trial, does not differentiate between the two remedies and only argues that the evidence of estoppel was legally insufficient. See *Champeau* v. *Fruehauf Corp., supra* at 1275 (where trial judge fails to state grounds for decision on new trial motion, decision should be affirmed only if it can be supported by a specific ground stated in motion).

with controlling principles of law.[15] See *Ross* v. *Chesapeake & O. Ry.*, 421 F.2d 328, 330 (6th Cir. 1970) (review of record disclosed "no sound basis" for contingent grant of new trial where judge failed to specify grounds). For these reasons, we reverse the judge's conditional grant of a new trial.

3. *Unfair and deceptive practices under G. L. c. 93A.* The broker challenges the judge's conclusion that the sellers did not violate G. L. c. 93A, § 11, by refusing to pay the broker a finder's fee. The broker argues that the judge erred as a matter of law in concluding that the sellers justifiably withheld payment of the fee to the broker on advice of their counsel. The broker asserts that, even if reliance on the advice of counsel were recognized as a defense to a c. 93A claim, no reasonable view of the facts in this case would support that defense. The broker's c. 93A claim alleges that the sellers never intended to honor their obligation to pay the agreed brokerage commissions.[16] We grant due regard to the judge's findings of fact unless they prove to be clearly errone-

---

[15]The dissent chides the court for even considering the role of the jury in this matter. *Post* at 146. We believe, however, that, "[w]hile we must guard against usurping the trial court's prerogative with respect to seriously erroneous jury verdicts, we must be equally diligent in protecting the jury's function. Direction of a new trial on an issue determined by a jury without the articulation of a sufficient basis for such action effects . . . 'a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts.'" *Crane* v. *Consolidated Rail Corp.*, 731 F.2d 1042, 1051 (2d Cir.), cert. denied, 469 U.S. 854 (1984), quoting *Lind* v. *Schenley Indus.*, 278 F.2d 79, 90 (3d Cir.), cert. denied, 364 U.S. 835 (1960).

[16]The broker also argues on appeal that the judge improperly concluded that "it would appear that the [broker's] failure to appeal the adverse ruling on [the c. 93A] claim [as part of the first appeal to this court] has resulted in a waiver." It is the broker's position that it did not waive the c. 93A claim by omitting to discuss it specifically in the original appeal to this court. The broker claims that it did not have to appeal from the adverse decision respecting the c. 93A claim because the fate of that claim depended entirely on the central issue of the applicability of the § 87RR bar to recovery of commissions and thus was implicitly included in the appeal. In any event, the broker points out that, on remand, it amended the complaint to assert a c. 93A claim against the sellers, which was not objected to and was allowed by the judge. It is our opinion that the c. 93A claim, as raised by the amendment, was properly before the judge.

ous. Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). The judge found that the sellers refused to pay the broker commissions only after they were so directed by counsel on the ground that Hackett was an unlicensed broker and could not legally collect commissions for effectuating the sales. The judge further found that the sellers were unaware at the time they entered into the commission agreements that the broker did not have a license. We cannot say that these findings are clearly erroneous, because the testimony of the sellers, if believed, supports these conclusions. To be sure, the conflicting testimony presented in this case allowed for opposing conclusions as to whether the sellers engaged in unfair and deceptive practices of the unscrupulous type condemned by c. 93A, but where the evidence leads equally to competing conclusions, judges and juries are in the best positions to make the ultimate choice, especially given their superior opportunity to assess the credibility of the witnesses. *Whitehall Co.* v. *Barletta*, 404 Mass. 497, 503 (1989). Notwithstanding the fact that we might arrive at a different conclusion with respect to this issue, we cannot state that the judge was completely unjustified in viewing this matter as a legitimate dispute of rights and obligations.

To summarize, the order allowing the sellers' motion for judgment notwithstanding the verdict is reversed as is the conditional allowance of the motion for a new trial. The broker's c. 93A counterclaim was properly dismissed. Judgment is to be entered in accordance with the jury's verdict.

*So ordered.*

O'CONNOR, J. (dissenting). In my view, the court's reversal of the trial judge's allowance of the sellers' motion for judgment notwithstanding the verdict as to the broker's claim for real estate commissions is wrong. It is also my view that the court's reversal of the conditional allowance of the sellers' motion for a new trial is wrong, and it is my further view

that the flaws in the court's reasoning on both issues are serious and they are numerous.

1. *Judgment notwithstanding the verdict.* In *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 403 Mass. 291, 295-296 (1988) (*Turnpike Motors I*), the court said: "We come then to the broker's claim that the sellers should be estopped to deny the broker's right to recover a full commission. The *broker's claim is based on its assertion* that, when it told a representative of the sellers that it was not a real estate broker, the sellers' representative answered that the absence of a license would not be a problem. The broker claims that the sellers agreed that the sales of the two businesses would be in the form of sales of corporate stock. *It further claims that it easily could have obtained, as it now has, a real estate broker's license if it had known one would be needed* and that the sellers restructured the sales as sales of assets rather than of stock for the purpose of defeating the broker's commissions." (Emphasis added.)

The court continued: "*If the facts are as the broker claims, the sellers would be estopped* to deny the broker a full commission. There is, of course, the question whether the broker reasonably relied on the sellers' representations. See *O'Blenes* v. *Zoning Bd. of Appeals of Lynn*, 397 Mass. 555, 558 (1986), and cases cited." (Emphasis added.) *Id.* at 296. Now, in the present appeal (*Turnpike Motors II*), the court says, "In *Turnpike Motors I, supra* at 296, we discussed four facts alleged in the broker's pleadings, and we stated that, if these facts were true, the sellers would be estopped to deny the broker full commissions. Both the judge and the sellers, as well as the dissent in this appeal, have taken that discussion to mean that *Turnpike Motors I* holds that the sellers can only be estopped to deny the broker full commissions if the broker is able to prove that these four specific facts are true. Our conclusion in *Turnpike Motors I*, however, that certain of the facts alleged by the broker, if true, would lead to an estoppel, does not prevent the broker from making its case based on other facts alleged within the pleadings, nor does it necessarily require that proof of each of these specific

facts is a threshold step that the broker must climb in order to prove its case." *Ante* at 122-123. It should surprise no one that, at the trial following *Turnpike Motors I*, the trial judge and the sellers, and indeed the broker, too, took the quoted discussion in *Turnpike Motors I* to mean that the four facts, which this court identified as the only facts on which the broker based its claim, were essential to the broker's case. As the quoted passage states, "[t]he broker's claim is based on its assertion" of those four facts, including the assertion that "it [the broker] easily could have obtained, as it now has, a real estate broker's license if it had known one would be needed." Indeed, in so characterizing the broker's claim, the court not only had the broker's pleadings before it, but had the broker's appellate brief before it as well. In that document, the broker argued: "The Sellers should not be allowed to trick the Broker into failing to get its broker's license (something it could have done easily . . .) and then assert that they can refuse to pay the agreed commissions because the Broker is not a licensed real estate broker."

It is most unfair for the court now, after trial, effectively to amend the law of the case that it established in *Turnpike Motors I*, on which the judge and the parties properly relied. It is unfair for the court now to declare for the first time that the broker really did not have any burden to prove that it forwent obtaining a real estate broker's license in reliance on the sellers' representations, as it alleged, and, instead, only had to prove that it produced buyers as a result of the sellers' representations. It is beyond reasonable question that the judge's conduct of the trial and the parties' trial strategies were dictated to a large degree by the court's clear statement in *Turnpike Motors I* that, to make out estoppel, the broker would have to prevail on the four identified questions. Indeed, the briefs in the present appeal do not even address the question whether the evidence would warrant the jury in finding that the sellers' representations to the broker induced the broker to procure buyers for the sellers. Such a distortion of the issue defined by the pleadings and by *Turnpike Mo-*

*tors I,* and on which the trial focused, cannot be the right way to do judicial business.

Unfairness in the form just mentioned is not the only problem, however. Even if, somewhere in the record, the court could point to a shred of evidence that the sellers' representations about the lack of need for a real estate broker's license induced the broker to produce buyers, which the court cannot do because there is no such evidence,[1] that evidence, if believed, would not result in the sellers' being estopped under heretofore declared estoppel principles from relying on G. L. c. 112, § 87RR, to deny the broker an agreed commission. The court has said that "[i]n order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done *and which has resulted to his harm* and that the other knew or had reasonable cause to know that such consequence might follow" (emphasis added). *O'Blenes* v. *Zoning Bd. of Appeals of Lynn, supra* at 558, quoting *Boston & A.R.R.* v. *Reardon,* 226 Mass. 286, 291 (1917). If, as the court says, the evidence would have warranted a finding that the sellers' representation about the form the contemplated sales would take and about a resulting lack of need for a broker's license induced the broker to produce buyers for the automobile dealerships, traditional estoppel principles would require that, for estoppel to obtain, the broker also would have to show that the broker was harmed by the induced conduct, namely the production of buyers. How was the broker harmed by producing buyers? The broker's claim is that it was harmed by not receiving substantial real estate commissions, not by the fact that it produced buyers. The court tells us that "the broker suffered detriment from its uncompensated, but successful, efforts on behalf of the sellers." *Ante* at 124. If the court is relying on the broker's fail-

---

[1] Surely, if there is evidence in the record that the broker was induced by the sellers' representations to produce buyers for the sellers' businesses, as the court claims there is, the court should be able to quote the relevant testimony or at least identify the places in the trial transcript where it may be found.

ure to be paid as the detriment needed for estoppel, the court should explain how the failure to be paid was due to the broker's production of buyers rather than the broker's failure to obtain the licensing required by G. L. c. 112, § 87RR. It is no mere happenstance that the broker's claim has always been that the broker reasonably relied on the sellers' representations and, as a result, *did not obtain a real estate broker's license which it easily could have obtained.* If those facts had been proved, which, as I shall show, they were not, then and only then would the broker have shown that the sellers' representations induced the broker to refrain from taking steps necessary to entitle it to the agreed real estate commissions. Only by proving those facts could the broker have demonstrated the detrimental reliance required for estoppel.

The court states that the evidence "would support *the jury's conclusion* that Looney's representations to the broker induced the broker to procure buyers for the sellers" (emphasis added). *Ante* at 124. As I have said, there was no such evidence, but, even if there were, it is clear that the jury did not conclude that Looney's representations induced the broker to procure buyers for the sellers. The judge's relevant jury instructions were as follows:

"Now what do we mean by estoppel . . . 'it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done, and which has resulted to his harm, and that the other knew or had reasonable cause to know that such consequence might follow.'. . . [T]he reliance of the party seeking the benefit of estoppel must have been reasonable. . . . That would mean that the Newbury Group would have to establish more probably than not that it was induced by the conduct of Eugene Looney . . . to do something different from what it otherwise would have done, and that has resulted in Newbury's harm and that Eugene Looney knew or had reasonable cause to know that such consequences might

follow. . . . [Y]ou will have to determine whether or not Looney . . . said that the absence of a license would not be a problem . . . agreed that the sale of the two businesses would be in the form of sales of corporate stock . . . [b]ecause corporate stock would be a sale of the business without involving separate sales of real estate . . . that conduct or statements allegedly made by Eugene Looney . . . led the Newbury interest to do something other than they would have done; *namely, to obtain a real estate broker's license*, if they were acting in what courts refer to as reasonable reliance on the representations allegedly made by Mr. Looney." (Citation omitted; emphasis added.)

As the court has frequently said, juries will be presumed to have followed judges' instructions. *O'Connor* v. *Raymark Indus.*, 401 Mass. 586, 590 (1988), and cases cited. Here, there is nothing in the judge's instructions that would authorize the jury to consider whether Looney's representations to the broker induced the broker to procure buyers for the sellers. Rather, the jury were told that their task was to determine whether the sellers' representations, through Looney, to the broker induced the broker not to do what the broker otherwise would have done, namely, obtain a real estate broker's license.

The question, then, that the court should have addressed in reviewing the judge's allowance of the sellers' motion for judgment notwithstanding the verdict is whether the broker produced evidence at the trial that it was reasonably induced by the sellers' representations to forgo obtaining a real estate broker's license. The judge ruled that the broker failed to meet its burden of production of evidence, and in my view he was correct.

As the court recognizes, *ante* at 121, the question is whether "anywhere in the evidence, from whatever source derived, any combination of the circumstances could be found from which a reasonable inference could be drawn in favor of the [broker]." *Dobos* v. *Driscoll*, 404 Mass. 634,

656, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850
(1989), quoting *Poirier* v. *Plymouth*, 374 Mass. 206, 212
(1978). I shall set forth the relevant evidence with that stan-
dard in mind. David Hackett owned all the stock in Newbury
Group, Inc., whose business before September, 1983, was
"mainly the employment agency business," and he was its
sole employee. One day Hackett went to see "someone"
about "getting a car" and that person told him that he had a
brother who might be looking for an automobile dealership.
As a result, Hackett called Eugene Looney, who was the
president of Turnpike Motors, Inc., and asked him if he
would be interested in selling his dealership. Looney said he
would be. Hackett told Looney that he was not a real estate
broker, but that he would like to sell Looney's business.

Hackett testified that two or three days later he met with
Looney and he brought to that meeting "a simple agreement
that said [he] would get . . . 10 percent of the proceeds of the
business, of all the monies." He testified that Looney said
Hackett would have to talk with Attorney Gary Widett
about it. According to the evidence, Mr. Widett was the sell-
ers' attorney. Hackett testified that he later told Mr. Widett
in Looney's presence that he would want ten per cent com-
missions on the possible sale of the businesses owned by
Turnpike Motors, Inc. and Gene's Foreign Car Service, Inc.
Mr. Widett answered that a ten per cent commission was
"ridiculous." According to Hackett's testimony, "Widett was
not very cooperative."

Hackett also testified that on September 22, 1983, he was
at the Boston Mazda dealership owned by Turnpike Motors,
Inc., and from there he spoke with Mr. Widett on the tele-
phone. He then and there typed two agreements reflecting
terms that he and Mr. Widett had discussed, and he, the two
Ryans (plaintiff sellers), and Looney signed them. One
agreement was between Newbury Group, Inc., and Turnpike
Motors, Inc., doing business as Boston Mazda (seller). Dated
September 22, 1983, it provided in relevant part, "Newbury
Group, Inc. shall be owed one hundred eighty thousand dol-
lars ($180,000) even if the sales price of said corporation is

sold for less than one million eight hundred thousand dollars. If the sales price is more than one million eight hundred thousand dollars, Newbury Group, Inc. will be owed ten percent of the difference between one million eight hundred thousand dollars and the actual sales price. . . . It is understood that the assets of the corporation will include all the real estate at 201 Cambridge Street, the entire parts inventory, equipment, and office furnishings. . . ." The other agreement, also dated September 22, 1983, was between Newbury Group, Inc., and Gene's Foreign Car Service, Inc. (seller). Its material provisions were as follows: "Newbury Group, Inc. shall be owed one hundred fifty thousand dollars ($150,000) even if the sales price of said corporation is sold for less than one million five hundred thousand dollars. If the sales price is more than one million five hundred thousand dollars, Newbury Group, Inc. will be owed ten percent of the difference between one million five hundred thousand dollars and the actual sales price. . . . It is understood that the assets of the corporation will include all the real estate at 1280 Cambridge Street, the entire parts inventory, equipment, and office furnishings. . . ."

Asked whether Hackett and Looney had a discussion prior to September 22, 1983, about how the companies would be sold, Hackett answered that they had. Hackett was then asked, "What did he say?" and Hackett answered, "That since I wasn't a broker we have to structure the deal as a sale of assets." At that point, the court took a recess. Following the recess, Hackett returned to the witness stand and said that he wished to change his testimony about what Looney had said to him. When again asked what Looney had said about how the sale would be structured, Hackett answered, "If we structured the sale as a sale of stock we could — that would allow me to sell the business not as a real estate agent, but it would still be legal."

On cross-examination of Hackett, the following questions were asked and answers given:

*Q.*: "Now you testified on direct examination that you knew the assets of the corporation were being sold. Correct?"

*A.*: "The stock, yes. I thought it was the same thing. But I remembered they said they wanted to sell the stock of the corporation."

*Q.*: "You testified under oath in your deposition that you knew the assets were being sold, didn't you?"

*A.*: "I thought it was the same thing that they said was stock. However the agreement is written up, okay. Just however the agreement is written up. Mr. Widett, he's the one who was the engineer."

*Q.*: "You said he's the engineer. Did he dictate the agreement to you?"

*A.*: "No."

*Q.*: "Oh, okay."

*A.*: "I did. But he changed whatever he wanted to change."

". . .

*Q.*: "Did he dictate the agreement to you?"

*A.*: "I told him what I wanted and he changed the words that he wanted. And finally what I did is I insisted that in there we put that a minimum commission be paid."

*Q.*: "A minimum commission be paid?"

*A.*: "That's right."

*Q.*: "And that was for the sale of real estate and assets and whatever was going to be sold. Right?"

*A.*: "That was considered part of the stock of the corporation."

Hackett testified with respect to the question whether, in reliance on the sellers' representations, the broker refrained from obtaining a real estate broker's license which it easily could have obtained before performing the services for which the broker now claims commissions. The broker's claim that it easily could have obtained a broker's license before the services were performed was premised on an officer of Newbury Group, Inc., being an attorney (in *Turnpike Motors I, supra* at 295, the court observed, "The broker's omission was relatively minor in view of the fact that it could have easily obtained a license because one of the officers was an attorney"). Hackett testified that, in September, 1983, Attorney John

Zizza, Hackett's friend, was attorney for Newbury Group, Inc. Asked whether Mr. Zizza ever became an officer of Newbury Group, Inc., Hackett said, "Yes, he did." Asked when that occurred, Hackett answered, "I think it was in the spring of '84. I'm not, I'm not 100 percent sure, but I think it was around the spring of 1984. Winter or spring. I'm not sure." Hackett also testified as follows:

*Q.*: "Could you have had Mr. Zizza file an application for a real estate broker's license back in September, 1983 if you thought you had to do it?"

*A.*: "Sure."

The evidence disclosed that the services for which commissions are sought in this case were completed in 1983.

In allowing the sellers' motion for judgment notwithstanding the verdict, the judge reasoned that the evidence at trial did not warrant a finding either that the broker easily could have obtained a real estate broker's license before brokering the dealership sales or that, even if such a license were obtained, its brokerage activities would have been lawful. The judge also reasoned that the evidence did not warrant a finding that the sellers restructured the deals from sales of corporate stock to sales of real estate and personalty for the purpose of defeating the broker's commissions. I agree with the judge's reasoning. I also am satisfied, as I discuss below, that there are other inadequacies in the evidence that are fatal to the broker's counterclaim. Of course, on review, the judge's reasoning, no matter how informative it may be, is not critical. "If any valid basis exists for allowing a judgment notwithstanding the verdict, [the court must] affirm the allowance, even if the judge based his decision on an erroneous principle." *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 572 (1986).

Hackett was Newbury Group, Inc.'s, only employee and the only representative of Newbury Group, Inc., to deal with the sellers. Would the evidence have warranted the jury in finding that Hackett reasonably relied on representations by Looney that the sales would be in the form of corporate stock and therefore the lack of a real estate broker's license would

not be a problem? The broker argues, "There is no factual basis in the record to indicate that Hackett should not have relied upon the combination of: 1) Looney's representations; 2) his own reasonable assumption that Looney's representa-' tions were based on the advice of his counsel, Widett; and 3) the terms of the finder's fee agreements which reflected the representation[s]." Of course, the sellers shouldered no burden to produce evidence that Hackett should not have relied on Looney's representations and other things. The burden was on the broker to show that Hackett did rely, and relied reasonably, thereon. In any event, the only evidence of Looney's representations that could possibly be viewed as supporting the broker's position was Hackett's testimony that, prior to September 22, 1983, Looney told Hackett that, "[i]f [they] structured the sale as a sale of stock, [they] could — that would allow [Hackett] to sell the business not as a real estate agent, but it could still be legal." In my view, no fact finder would have been warranted as a matter of law in finding that observation by Looney to be a commitment to structure the sale as a sale of corporate stock. Also, in my view, no fact finder would have been warranted in finding that Hackett relied reasonably on the stated opinion of an automobile dealer, not shown to have received legal training, concerning the proper construction and application of statutes dealing with real estate transactions, brokers, and commissions. My view finds support in the broker's second argument, that is, that Hackett reasonably assumed that Looney's representations were based, not on his own training or experience, but on the advice of Mr. Widett.

Would the jury have been warranted in finding that Hackett reasonably assumed Looney's representations were based on the advice of Mr. Widett? The answer is clearly "No." As the broker argues elsewhere in its brief, "There is no evidence in the record when Looney's counsel learned of Newbury's lack of license. There is no evidence in the record that Looney's counsel advised Looney that such a defect barred recovery." In short, there is no evidence that, if Looney did suggest that the deals could be structured as sales of corpo-

rate stock, and that therefore Hackett would not need a real estate broker's license, those matters previously had been discussed by Looney and Mr. Widett. A finding that Hackett reasonably assumed that such a discussion had occurred clearly would have been unwarranted. Moreover, the record is silent with respect to any evidence reasonably entitling Hackett to assume that Looney's representations reflected advice from Mr. Widett concerning proper protection of the broker. Mr. Widett, after all, was the sellers', not the broker's, attorney, and there is no evidence to suggest that Looney ever consulted with Mr. Widett on Hackett's (or the broker's) behalf or ever told Hackett he would do so.

Contrary to the broker's third argument, the terms of the finder's fee agreements, dated September 22, 1983, neither reflect, nor support, the contention that Hackett reasonably relied on a representation that the deals would take the form of sales of corporate stock. The broker points to the following language in those agreements: "It is understood that the assets of the corporation will include all real estate at 201 Cambridge Street [in one agreement, and 1280 Cambridge Street in the other], the entire parts inventory, equipment, and office furnishings." The broker argues that that language "contributed by Widett, confirmed in writing that the transactions would not require separate sales of real estate, because the real estate was represented to be an asset that would be included as an asset of the corporations whose stock Looney said would be sold." There was no evidence that that language "was contributed by Widett" and not by Hackett. Furthermore, the terms of one of the finder's fee agreements, that "the sales price of said corporation[s]," and the terms of both of the finder's fee agreements, that the "assets of the corporation[s] will include all real estate," as a matter of law could not have been found to confirm an understanding that the sales would be sales of stock. The agreements focused on computation of the finder's fee. They only made clear that the computation would take into account the fact that the transactions involved real estate as well as other property. The jury would not have been warranted in finding that the

agreements referred to the form of the contemplated transactions rather than their substance only.

The court's reliance on the agreements between the sellers and buyers as constituting evidence that the broker reasonably relied on the sellers' representations concerning the lack of necessity for the broker to be licensed, *ante* at 126, is misplaced. Expressions of understanding as to who, between the sellers and the buyers, would be responsible for real estate commissions, cannot be viewed as commitments to the broker. Furthermore, the agreements between the sellers and the buyers were obviously executed after the broker's services had been performed. Therefore, the broker could not have been induced by those agreements to produce the buyers or to do so without first obtaining proper licenses.

It is clear that the evidence did not warrant a finding that the broker relied reasonably on representations by Looney concerning either the form the sales would take or the legal effect thereof with respect to the broker's entitlement to commissions. On that basis alone, the judge properly ordered judgment for the sellers.

That brings me to the broker's claim that the broker "easily could have [and, inferentially would have] obtained, as it now has, a real estate broker's license if it had known one would be needed." *Turnpike Motors I, supra* at 296. The court opined that, on the basis of the summary judgment materials, the broker "could have easily obtained a license because one of the officers was an attorney. See G. L. c. 112, § 87SS (1986 ed.)." *Id.* at 295. The question before the judge, however, and now before the court on appeal, is whether there was evidence at trial that, when the broker performed the services for which it seeks commissions, it could and would have been licensed as a real estate broker if it had not been misled into thinking the sales were to be sales only of corporate stock. As the judge recognized, there was no such evidence. There was no evidence that prior to, or even during, the performance of its brokering services, one of Newbury Group, Inc.'s, officers was an attorney. Specifically, there was no evidence that Mr. Zizza was an officer of the

corporation at the relevant time. To the contrary, the only evidence on that matter was that Mr. Zizza became an officer in the winter or spring, 1984, after the "finder" services had been fully performed. Furthermore, as the judge also recognized, there was no evidence that, if Hackett had not been told that the sales would involve only corporate stock, Hackett would have made Mr. Zizza an officer immediately so that Mr. Zizza could become a licensed real estate broker and then obtain a license for the corporation pursuant to G. L. c. 112, § 87UU (1990 ed.). The judge correctly points out in his memorandum that, even if Mr. Zizza had obtained these licenses, the broker could not have brokered transactions involving real estate. This is because Hackett, the corporation's sole employee and the only person with whom Looney dealt, was not himself licensed as a "salesman" as required by c. 112, §87RR (1990 ed.), and could not easily have become licensed. Chapter 112, § 87SS, provides among other things that every individual applicant for a license as a salesman must not only pass a written examination but also "as a prerequisite to taking such examination, submit proof . . . that he has completed [approved] courses in real estate subjects." In addition, c. 112, § 87VV (1990 ed.), provides, "No salesman who is not licensed shall be affiliated with a broker." The judge was correct, then, in concluding that the evidence as a matter of law did not warrant a finding that the broker forwent obtaining a real estate broker's license in reasonable and detrimental reliance on representations by the sellers. The judgment for the plaintiffs (defendants in counterclaim) that the broker is not entitled to real estate commissions notwithstanding the verdict should be affirmed.[2]

---

[2]The court orders the entry of judgment for the broker in accordance with the verdict. Thus, Newbury Group, Inc., realizes several hundreds of thousands of dollars in return for illegally brokering transactions involving real estate and for illegally affiliating with an unlicensed real estate salesman, and Hackett is similarly compensated for illegally acting as an unlicensed real estate salesman. The court orders all of this in the name of equity (which apparently is no respecter of the law). Strange - the law!

2. *The conditional allowance of the motion for a new trial.* Had my view expressed above prevailed, there would be no need to discuss the judge's conditional allowance of the sellers' motion for a new trial. Since my view has not prevailed, however, I turn to the court's reversal of the judge's conditional grant of a new trial. The judge granted a new trial pursuant to Mass. R. Civ. P. 50 (c). The court concludes that this was error. The court's conclusion appears to be based on three reasons: (1) "Rule 50 (c) does permit the conditional ruling on a motion for a new trial, as the judge made here, but the same rule requires the judge to 'specify the grounds for granting or denying the motion for the new trial.' . . . The judge in this case, however, failed to specify any grounds for his conditional ruling beyond his brief statement that the verdict was against the weight of the evidence"; (2) the judge "raised serious questions about his motivation," by stating his "intention that this court reexamine *Turnpike Motors I*"; and (3) "we find nothing in the record or in the sellers' arguments on appeal to convince us that the jury failed to exercise an honest and reasonable judgment in accordance with controlling principles of law." *Ante* at 127-130.

The judge did all that a judge can reasonably be required to do with regard to specifying his reasons for conditionally granting the sellers a new trial. After devoting several pages in a nineteen-page memorandum to the question of the sufficiency of the evidence to warrant findings in the broker's favor on the reasonable reliance aspect of the estoppel issue, the judge stated that, even if the evidence was sufficient on that sub-issue to withstand the sellers' motion for judgment notwithstanding the verdict, the verdict was against the weight of the evidence. See *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 59 (1948) ("One of the most common and *well recognized grounds* in law for the setting aside of a verdict is that it *is against the weight of the evidence*" [emphasis added]). The court gives no clue as to what more rule 50 (c) requires for a statement of the grounds on which a new trial is conditionally granted than a

statement, as here, that, with respect to specified issues, the verdict is against the weight of the evidence. The court does not cite a single case, State or Federal, that supports the court's holding here that the judge's specification of grounds was inadequate. Rule 50 (c)'s requirement that grounds be specified was clearly met in this case.

The judge's statement, *made at a hearing on the sellers' motion to dissolve postverdict security* and to dismiss reach and apply claims, that "[p]art of [his] decision is a suggestion to [the Justices of this court] that they re-examine more closely what they did" in *Turnpike Motors I* does not suggest that *his conditional grant of a new trial* was motivated by a desire for such a reexamination. Indeed, it is difficult to comprehend how a new trial following this court's review of the judge's rulings as to the sufficiency of the evidence would be likely to produce such a reexamination.

The court says that the Justices are not convinced that the jury failed to exercise reasonable judgment. That statement betrays a serious misapprehension of the issue. The question is not whether the Justices are convinced that the jury acted reasonably. The question is whether the trial judge could have arrived at the opposite conclusion conscientiously, intelligently, and honestly. *Hartmann* v. *Boston Herald-Traveler Corp.*, *supra* at 60. The judge's discretion is to be disturbed only if it has been abused, *id.*, and "[a]buse of discretion in granting or refusing a new trial can so seldom be found that actual instances in which this court has set aside the action of the trial judge on that ground are almost nonexistent." *Id.* at 61. See *Robertson* v. *Gaston Snow & Ely Bartlett*, 404 Mass. 515, 520-521, cert. denied, 493 U.S. 894 (1989). Indeed, neither the court nor the broker points to a single case in which this court has held that a judge had abused his or her discretion in granting a new trial based on the judge's decision that the verdict was against the weight of the evidence. Yet, here the court reverses the judge's conditional allowance of the sellers' motion for a new trial without acknowledging the superior position of the judge, compared to the position of this court, to assess the credibility of wit-

nesses, and without discussing the evidence that may have prompted the judge conscientiously, intelligently, and honestly to conclude that the jury had not exercised honest and reasonable judgment in accordance with the law.

Looney testified that he never told Hackett that the transactions would involve transfers of stock rather than assets, that he never told Hackett that a real estate broker's license would not be necessary, and that Hackett never told him that Hackett was unlicensed. Furthermore, Hackett first testified that Looney had told him that, since Hackett was not a broker, the deal would have to be structured as a sale of assets, not stock. Only after a recess did Hackett change his testimony to say that Looney had told him the deal would involve a transfer of stock, not assets. Subsequently, on cross-examination, Hackett testified that he thought a sale of assets meant the same thing as a sale of stock. The court cannot fairly say, based on the record, that the judge abused his discretion in conditionally granting the sellers a new trial on the ground that the verdict was against the weight of the evidence.

I would affirm the judgment. Failing that, I would let stand the judge's grant of a new trial.